O4aFmarH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                        22 Cr. 91 (RA)

JOSEFINA MARINE,

                                 Hearing
         Defendant.

------------------------------x

                             New York, N.Y.
                             April 10, 2024
                             9:00 a.m.

Before:

                 HON. RONNIE ABRAMS,

                             District Judge

                   APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  MICHAEL HERMAN
    MICAH FERGENSON
    ROBERT SOBELMAN
    Assistant United States Attorneys

JOHN L. RUSSO
    Attorney for Defendant

Also Present:

Alexander Frenchman, Paralegal Specialist USAO
Bernard Seidler, Attorney for Defendant Ortega

1          (Case called)

2          MR. HERMAN:  Good morning, your Honor.

3          Michael Herman, Micah Fergensen, and Robert Sobelman

4   for the government.

5          We're also joined by paralegal, Alex Frenchman.

6          THE COURT:  Good morning, all.

7          MR. RUSSO:  Good morning, Judge.  John Russo on behalf

8   of Ms. Marine.

9          Judge, I'm so sorry.  I had this matter for 10 o'clock

10  both for when it was scheduled for yesterday and then when it

11  was moved to today, and I apologize your Honor.

12         THE COURT:  All right.  Yeah.  Please, go ahead.

13         Is there anything else?

14         MR. RUSSO:  Judge, my client is using a Spanish

15  language translator, but she's shackled completely.

16         Is there any way she can be unshackled, or should she

17  remain that way for the balance of the day?

18         THE COURT:  Let me ask the marshals.

19         MR. RUSSO:  Thank you.

20         THE COURT:  Is it okay to unshackle her for the

21  hearing?

22         THE MARSHAL:  Yes.

23         THE COURT:  Thank you.

24         MR. RUSSO:  Thank you, your Honor.

25         And thank you, marshals.

O4aFmarH

1    THE COURT:  So we're, of course, here for a *Fatico*

2    hearing.  How do you want to proceed?  Does the government want

3    to go first, or should we address some of the witnesses,

4    Mr. Russo, that I understand you intend to call, but I'm not

5    sure if they intend to testify or not, and I don't know if we

6    should deal with that first so we don't have to keep them wait

7    for the day, or if you want to wait until it's your time to

8    present.

9    MR. RUSSO:  Judge, I do intend to call Billy Ortega,

10   who I did speak with again yesterday.  He reaffirmed, one, that

11   he has counsel.  He knows he'll be given a fifth amendment

12   warning or other warnings the government wishes to give and the

13   Court wishes to administer.

14   Also, Ms. Marine intends to testify.  Keven Quezada

15   will not be testifying.  That is a late change.  I did speak

16   with him yesterday, and I got a message from him.  He has

17   decided, after consulting with his attorney, that he won't be

18   testifying.  And that's fine Judge; it might make the

19   proceedings a little bit quicker.

20   THE COURT:  All right.  So why don't we proceed with

21   the government's presentation.

22   MR. FERGENSEN:  Yes, your Honor.

23   The government calls Kaylen Rainey.

24   KAYLEN RAINEY,

25       called as a witness by the Government,

1        having been duly sworn, testified as follows:

2    DIRECT EXAMINATION

3    BY MR. FERGENSEN:

4    Q.  Good morning, Mr. Rainey.

5    A.  Good morning.

6    Q.  You testified in the trial of Billy Ortega; right?

7    A.  Yes.

8    Q.  Was your trial testimony truthful?

9    A.  Yes.

10   Q.  I'm not going to go through all of that in the same detail,

11   but I will ask a few questions today; okay?

12   A.  Okay.

13   Q.  Now, Mr. Rainey, you used to work as a drug courier for

14   Billy Ortega; right?

15   A.  Yes.

16   Q.  Do you see anyone here in the courtroom you used to work

17   with?

18   A.  Yes.

19   Q.  Who?

20   A.  Josefina Marine.

21   Q.  And what was Josefina Marine's role in Billy's drug

22   business?

23   A.  She kept the drugs and the money at her apartment.

24   Q.  And how would you, as a drug courier, interact with

25   Josefina Marine?

1   A.  When you needed the drugs to deliver, you would let her

2   know and she would let Billy know to confirm, and then she

3   would get them for you, or you would let Billy know, and he

4   would contact her to get them for you.  And then, when you --

5   at the end of the night, when you would collect all of the

6   money, you would give it to her.

7   Q.  Did Ms. Marine always hand you, directly, the drugs that

8   you would deliver?

9   A.  If you were around, she would hand them to you, or she

10  would leave them out somewhere, and you would get them.

11  Q.  Where would Marine store the drugs?

12  A.  The drugs were kept in a safe in a hallway closet.

13  Q.  Where would Marine store the money from the drug sales?

14  A.  It was kept in a safe in her bedroom closet.

15  Q.  So just to be clear, how many safes were there?

16  A.  There were two.

17  Q.  Mr. Rainey, I want to look at a few text messages together.

18          MR. FERGENSEN:  Mr. Frenchman, could you please pull

19  up Government Exhibit 111-52.

20          And your Honor, these are government exhibits from the

21  trial.

22          THE COURT:  Thank you.

23          MR. FERGENSEN:  And Mr. Frenchman, if we could just

24  zoom on the top two messages.

25          Thank you.  All right.

1  Q.  Mr. Rainey, these are text messages from a number that ends

2  in 5039.  Whose number is that?

3  A.  That's mine.

4  Q.  And in this green message, who are you texting with?

5  A.  That's Billy.

6  Q.  And what did you text him on September 25, 2020?

7  A.  Tell Ma put a pack out.

8  Q.  Mr. Rainey, who is Ma in this message?

9  A.  Josefina.

10  Q.  What was the relationship between Josefina and Billy?

11  A.  That's Billy's mother.

12  Q.  And you said put a pack out.  What's a pack?

13  A.  A pack was a baggie of drugs.

14  Q.  So what were you telling Billy to do in this message?

15  A.  To tell Josefina to leave a pack of drugs out.

16  Q.  All right.

17          MR. FERGENSEN:  Mr. Frenchman, let's go to Government

18  Exhibit 111-48 at page 10.  Great.

19  Q.  Now, Mr. Rainey, in this message from September 2020, you

20  say to Billy, you don't have to tell Ma take me another pack

21  out.  And then you say, I only got like one or two left.

22          What were you telling Billy in these messages,

23  Mr. Rainey?

24  A.  To let him now to have Josefina leave out another pack,

25  because I only hand one or two bags of cocaine left.

1   Q.  And within a pack, how many bags of cocaine would there

2   typically be?

3   A.  Ten.

4           MR. FERGENSEN:  Mr. Frenchman, let's go to Government

5   Exhibit 111-59, and we're going to look at page 11.  All right.

6   And let's -- oh, I'm sorry.  Yes.  Let's start with the middle

7   two messages.  Okay.

8   Q.  Mr. Rainey, I'll actually just focus you on the bottom

9   message.  This is in October 2020.  Billy messages you, as soon

10  as Ma gets home, and then he sends an address and says, three

11  Will $500.

12          Mr. Rainey, what was Will?

13  A.  Will was cocaine.

14  Q.  Was that a code you and Billy and others used?

15  A.  Yes.

16  Q.  And what does the $500 signify?

17  A.  How much the person was giving me.

18  Q.  All right.  And then I won't go through the others, but are

19  these also addresses for cocaine deliveries and the amounts you

20  were going to get from the customer?

21  A.  Yes.

22  Q.  And these three deliveries -- before he sends you the

23  information, he says, as soon as Ma gets home; right?

24  A.  Right.

25  Q.  Mr. Rainey, did you live with Josefina at the time?

1    A.   Yes.

2    Q.   You guys shared the same apartment?

3    A.   Yes.

4         MR. FERGENSEN:  Mr. Frenchman, we can scroll down.

5    Q.   He sends another one that says, one will, five Es.

6         What was E?

7    A.   E was ecstasy.

8         MR. FERGENSEN:  Let's scroll down.

9    Q.   And how did you respond?

10   A.   I don't have Es either.

11   Q.   And how did Billy respond?

12   A.   She's passing it.

13   Q.   Who did you understand the "she" to be, there?

14   A.   Josefina.

15   Q.   All right.

16        MR. FERGENSEN:  Mr. Frenchman, let's go to Government

17   Exhibit 111-63.  We're going to go to page 47, please.  All

18   right.

19        Now, this is late November 2020, Mr. Rainey.  Could

20   you please read your text to Billy in the bottom right?

21   A.   I only got three so have Ma leave a pack out before she

22   leave.

23        MR. FERGENSEN:  And let's scroll down just to see what

24   the response was.  Billy writes back, cool.

25   Q.   When you asked Billy to make sure Ma left a pack out before

1    she leaves, was this an example of what you mentioned earlier

2    where, if she weren't home at the time, she would leave the

3    pack for you?

4    A.  Yes.

5            MR. FERGENSEN:  All right.  Let's go to Government

6    Exhibit 111-73.  We're going to go to page 7, Mr. Frenchman.

7    Yes.  Thank you, Mr. Frenchman.

8    Q.  All right.  This is January 31, 2021.

9            Can you please read your text to Billy here?

10   A.  I don't have no will, so tell Ma leave a pack out when she

11   get back home.

12   Q.  And Billy writes back, got you.

13           And, Mr. Rainey, were you asking Billy to ask Josefina

14   to leave a pack of cocaine out when she gets out home, here?

15   A.  Yes.

16   Q.  All right.

17           MR. FERGENSEN:  Now, Mr. Frenchman we can take that

18   down.

19   Q.  Mr. Rainy, we were just looking at some messages between

20   you and Billy; right?

21   A.  Yes.

22   Q.  Let's look at a text between you and a different number

23   now.

24           MR. FERGENSEN:  Mr. Frenchman, can you pull up

25   Government Exhibit 111-116, please?

1             All right.  And could you zoom on the participants

2    here, Mr. Frenchman?

3    Q.  All right.  Now, Mr. Rainey, you're a participant here;

4    right?

5    A.  Yes.

6    Q.  Do you know who the other participant is?

7    A.  I believe, Will Drayton.

8    Q.  And how do you recognize that?

9    A.  The 551.

10   Q.  The area code?

11   A.  Yes.

12   Q.  Okay.

13            MR. FERGENSEN:  Mr. Frenchman, let's go to page 3,

14   please.

15   Q.  All right, now, William Drayton messages you, you want to

16   do today, what did you understand him to be asking, Mr. Rainey?

17   A.  Cover his day for him.

18   Q.  And Mr. Rainey, I just ask you to slow down slightly, just

19   for the court reporter.

20   A.  Okay.

21   Q.  And how did you respond?

22   A.  Just tell him make sure Josefina leave a pack out.

23   Q.  And Josefina there, is that Josefina Marine?

24   A.  Yes.

25   Q.  And just tell him, who is the "him"?

1    A.  Billy.

2    Q.  All right.  Let's go back to one more message between you

3    and Billy.

4          MR. FERGENSEN:  Mr. Frenchman, can we go to Government

5    Exhibit 111-34, and we're going to go to page 34 of the PDF.

6          Okay.

7    Q.  So this is July 2019, and Billy messages you, hey, after

8    this, go straight to the crib, bro, so you can give her what

9    you made today, and before you give it to her, give me the

10   account.

11         All right.  Mr. Rainey, when Billy messaged you, go

12   straight to the crib, what did you understand him to mean by

13   that?

14   A.  The apartment that we lived at.

15   Q.  And who else lived in that apartment?

16   A.  Me and Josefina and Keven, her son.

17   Q.  And you said, so you can give her what you made today.

18         Who did you understand her to be?

19   A.  Josefina.

20   Q.  Were there any other women living in the apartment with

21   you?

22   A.  No.

23   Q.  And when you said, what you made today, what did that refer

24   to?

25   A.  The proceeds from the drug sale.

1   Q.  And when he said, before you give it to her, give me the

2   account, what did you understand him to be asking you to do

3   there?

4   A.  The total sum of the money made from the proceeds.

5   Q.  Did you call that the account sometimes?

6   A.  Yes.

7   Q.  Mr. Rainey, I won't show you a message about it, but what

8   is "bread"?

9   A.  Money.

10  Q.  All right.

11          MR. FERGENSEN:  Mr. Frenchman we can take that down.

12  Q.  Now, Mr. Rainey, in addition to working for Billy's drug

13  business, did Josefina have a real job?

14  A.  Yes.

15  Q.  Where did she work?

16  A.  She worked at Macy's.

17  Q.  And Mr. Rainey, I'll just ask you to speak in the

18  microphone.  It's a little hard to hear.

19  A.  She worked at Macy's.

20  Q.  Thank you, Mr. Rainey.

21          And in a day or a week, when would she typically work?

22  A.  Like three, four days a week.

23  Q.  When she had to go to work but you were making drug

24  deliveries, how would you get the drugs to deliver?

25  A.  She would give them to you directly, or if you weren't

1    around, she would leave them out somewhere.

2    Q.  Mr. Rainey, was Josefina ever sick?

3    A.  I believe she had cancer at one point.

4         MR. RUSSO:  Sorry, Judge.  Can you ask the witness to

5    speak up?  I couldn't hear that last response.

6    A.  I believe she had cancer at one point.

7    Q.  And to your knowledge, was she hospitalized for extended

8    periods?

9    A.  I don't remember.  I don't think so.

10   Q.  Do you remember her being hospitalized even for a short

11   period?

12   A.  Not that I can recall.

13   Q.  When she was sick and when she was working, did she still

14   help with Billy's drug business?

15   A.  Yes.

16        THE COURT:  To your knowledge, how long did she do

17   that for, over what period of time?

18        THE WITNESS:  As long as I can remember, like four

19   years.  Four years.

20   Q.  Mr. Rainey, we've been talking about how you would

21   typically get drugs from Josefina; right?

22   A.  Yes.

23   Q.  Did Billy ever tell you to pick up drugs from a different

24   apartment in the Fulton Houses?

25   A.  Yes.

1   Q.  Whose apartment?

2   A.  Will.

3   Q.  And where was Will's apartment?

4   A.  Across the street.

5   Q.  And was it Will's personal apartment or a family member of

6   Will's?

7   A.  It was a family member of his.

8   Q.  Whose?

9   A.  His mother.

10  Q.  And, did you pick up drugs from Will's mother's apartment

11  on occasion?

12  A.  I have a few times.

13  Q.  And why did you do that?

14  A.  The drugs were over at his apartment at the time.

15  Q.  And do you know why the drugs were at Will's mom's

16  apartment a few times?

17  A.  I believe they weren't at our apartment anymore.

18  Q.  And after the drugs were at Will's mom's apartment, did

19  they come back to your and Josefina's apartment?

20  A.  Yes.

21  Q.  Mr. Rainey, I want to turn briefly to March 17, 2021.

22        Do you specifically remember that day?

23  A.  No.

24  Q.  At the time, was that day working for Billy's drug business

25  different than any other day for you working for Billy's drug

1  business?

2  A.  No.

3  Q.  Who typically gave you the drugs when you were working for

4  Billy's drug business?

5  A.  Josefina.

6  Q.  Mr. Rainey, I'm just going to ask you a few more questions.

7  Did anyone named Mike work with Billy?

8  A.  Yes.

9  Q.  What was his role in the delivery service?

10  A.  He was a runner.

11  Q.  You mentioned Keven.

12      What was his relationship to Josefina?

13  A.  That was her son.

14  Q.  Did he ever work for Billy in the delivery service?

15  A.  Yes.

16  Q.  What was his role?

17  A.  A runner.

18  Q.  Mr. Rainey, Judge Abrams asked you this, but as far as you

19  can recall, was there a time when Josefina was not working for

20  Billy's drug business?

21  A.  Umm, yes.

22  Q.  When was that?

23  A.  Like, in the earlier years that I was around, I don't

24  remember her being around, like involved.

25      MR. RUSSO:  I'm sorry, Judge.

1          Is there a microphone that the witness could speak

2     into?

3          THE COURT:  Yeah.  There is a microphone.  We're going

4     to bring it a little closer.

5          I believe he said, like, in the earlier years --

6          THE WITNESS:  Yeah.  The earlier years that I was

7     around, I don't remember her being involved.

8     Q.  And then once, to your knowledge, she started working with

9     Billy's drug business, was there a time when she was not

10    working for Billy's drug business?

11    A.  No.

12    Q.  One moment, your Honor.

13         THE COURT:  I'm going to ask a question.

14         Do you have any reason to believe that Josefina knew

15    that there was fentanyl in the drugs that she was giving you?

16         THE WITNESS:  No.

17         MR. FERGENSEN:  May I have a moment, your Honor?

18         THE COURT:  You may.

19         (Counsel conferred)

20    BY MR. FERGENSEN:

21    Q.  Mr. Rainey, did you know if there was fentanyl in the drugs

22    you were delivering in March 2021?

23    A.  No.

24         MR. FERGENSEN:  Nothing further, your Honor.

25         THE COURT:  All right.  Thank you.

1          Mr. Russo, any cross-examination?

2          MR. RUSSO:  Yes, your Honor.

3          Your Honor, may I take a brief five-minute break to

4     speak with Mr. Seidler?

5          THE COURT:  Let's keep it to two minutes, since we got

6     started so late today.

7          (Counsel conferred)

8          MR. RUSSO:  Thank you.

9     CROSS-EXAMINATION

10    BY MR. RUSSO:

11    Q.  Mr. Rainey, do I understand correctly that you pled guilty

12    to charges, which included selling, delivery, and the

13    distribution of the fentanyl-laced drugs that killed three

14    people on March 17, 2021?

15    A.  Yes.

16    Q.  And prior to deciding to cooperate with the government,

17    were you advised of the amount the prison time you faced on the

18    charges that were levied against you?

19    A.  Yes.

20    Q.  How much time were you told you would face?

21    A.  20 years.

22    Q.  Just 20?

23    A.  20 years to life.

24    Q.  And you didn't want to go prison for that much time; did

25    you?

1    A.  No.

2    Q.  And the only option you had was to tell the government your

3    story, your version of events; is that correct?

4    A.  No.

5    Q.  What other options did you have?

6    A.  To not cooperate.

7    Q.  And go to trial, and you thought you might be able to

8    prevail?

9    A.  Yes.

10   Q.  But rather than go to trial, which you thought you could

11   prevail at, you decided to cooperate with the government?

12   A.  Yes.

13   Q.  And the principal reason you did that was to avoid prison

14   time?

15   A.  No.

16   Q.  What was the principal reason that you decided to cooperate

17   with the government?

18   A.  To do the right thing.

19   Q.  So you wanted to do the right thing?

20   A.  Yes.

21   Q.  Okay.  And so you don't expect any leniency?  You don't

22   expect any break on the amount of prison time that you're going

23   to do because of your distribution of the fatal fentanyl?

24   A.  I have no expectations.

25   Q.  Okay.  No expectations at all.

1    A.  No.

2    Q.  Okay.  And what you told the government had to be accepted

3    by them, right, before they offered you a cooperation

4    agreement; correct?

5    A.  Yes.

6    Q.  You met with them several times?  You proffered with them

7    several times?

8    A.  I've met with them; yes.

9    Q.  Okay.  And when you met with them, you told them things?

10   A.  Yes.

11   Q.  You answered questions?

12   A.  Yes.

13   Q.  And how many times did you meet with them before they were

14   satisfied with your story and offered you the cooperation

15   agreement, do you know?

16   A.  Three or four.

17   Q.  Now, let me ask you, Mr. Rainey, if what you had to say

18   wasn't in the government's view, useful to them, you wouldn't

19   have been offered this cooperation agreement, would you?

20   A.  No.

21   Q.  And you would have been left to face the 20 to life in

22   prison without any benefit or any help from the government?

23   A.  Yes.

24   Q.  Let me take you back to the time that you moved in and

25   rented a room in Josefina Marine's apartment.

1          How did you come to find that space?

2    A.  I have known them for years prior, so the room opened up,

3    and I was told, and I moved in.

4    Q.  Let's unpack that a little bit.  The room opened up and you

5    were told.  How did you know that the room opened up?  Who told

6    you that?

7    A.  Josefina did.

8    Q.  Josefina did?

9    A.  Yes.

10   Q.  So you and her had a speaking relationship?

11   A.  Yes.

12   Q.  How did she tell you?  She called you on the phone, sent

13   you a text message?

14   A.  I don't recall, exactly.  I was around.

15   Q.  So somehow, out of the blue, Josefina contacted you and

16   said, hey, Kaylen.  I have a room opened up.

17   A.  I'm not sure that's exactly how it happened.

18   Q.  Well, why did the room open up?  Did you know?

19   A.  Her daughter moved out.

20   Q.  Okay.  So she called you up to say, my daughter moved out,

21   and there's a room available for rent if you want.

22   A.  I don't know if that's how it happened.

23   Q.  But it was a phone call from Josefina.

24   A.  I don't know if it was a phone call.

25          MR. FERGENSEN:  Objection, your Honor.

1    THE COURT:  Overruled.  Let's just go on.  There's no

2  jury here.

3  Q.  Now, before you were offered the room in Josefina's

4  apartment, where were you living?

5  A.  Washington Heights.

6  Q.  And was there a problem with the location that you were

7  living in?

8  A.  It wasn't really a problem.  It was just, me and my

9  roommate, we were done, outlived our time together.

10  Q.  So it was good timing when you were advised that there was

11  a room available for rent in Josefina's house.

12  A.  Yes.

13  Q.  And you said that you knew them all; you were good friends.

14    How would you characterize your relationship with

15  Josefina and her family?

16  A.  I was good with them.

17  Q.  Okay.  And had you socialized with Josefina before moving

18  into her apartment?

19  A.  Yes?

20  Q.  And how -- recall one of the times that you socialized.

21    What did you do?

22  A.  I've known them for three, four years prior to moving in,

23  so I was around.  I worked in the neighborhood, so I hung

24  around her son, Keven, and I was around like that.

25  Q.  But I asked you, Mr. Rainey -- and if you don't understand,

1    I'm happy to repeat it -- give me one example of how you

2    socialized with Josefina prior to moving into her apartment.

3    A.   I would come to the house.  She would cook, you know.

4    Q.   She would cook?

5    A.   Yeah.  And she'd cook for people.

6    Q.   So she cooked dinner for you.

7    A.   She cooked dinner for everybody, like, if you were around,

8    like, you could eat.

9    Q.   Okay.  So you recall being invited to her home to eat food

10   that she cooked prior to you moving in?

11   A.   Yes.

12   Q.   During the three or four times that you met with the

13   government prior to getting a cooperation agreement, did you

14   mention that Josefina would cook for you prior to moving into

15   her apartment?

16   A.   I may have.

17   Q.   Did you mention that you socialized with the family prior

18   to moving into the apartment?

19   A.   Yes.

20   Q.   Did you mention that Josefina was the one who called you

21   and told you that she had a room available?

22   A.   I'm not sure.

23   Q.   Or did you tell the government that it was her son Keven,

24   who you worked with at Highline Ballroom, who told you about

25   the room that was available?

1   A.  I'm not sure.

2   Q.  Okay.  Now let's go to some things that you seem to be sure

3   of.  You said that you started working for Billy Ortega's drug

4   distribution business; is that correct?

5   A.  Yes.

6   Q.  And that was after you moved into Josefina's apartment?

7   A.  Yes.

8   Q.  So prior to moving into Josefina's apartment, prior to

9   taking the room, and prior to working for Billy's drug

10  business, you had no idea that anybody was in the drug

11  distribution business in that family; is that correct?

12  A.  I did know.

13  Q.  You did know.

14  A.  Yes.

15  Q.  Okay.  Now did you tell that to the government or did you

16  tell that to the government back in December of 2022, that you

17  didn't see any drugs, didn't know anything about drugs until

18  you moved into Josefina's apartment.

19  A.  I don't recall that.

20  Q.  You don't recall that either.  Okay.

21          Now, let me ask you this.  When you moved into

22  Josefina's apartment, is that the first time that you began

23  working as a drug courier?

24  A.  Yes.

25  Q.  And who offered you that position?

1    A.  Billy.

2    Q.  Billy.

3           So was Billy living there or were you having dinner

4    with him?  What were the circumstances surrounding Billy's

5    offer of employment to you?

6    A.  I don't remember exactly how it happened.

7    Q.  Okay.  So somehow, but you don't recall how, you got a job

8    running drugs for Billy Ortega.

9    A.  Yes.

10   Q.  And you were living in Josefina's apartment?

11   A.  Yes.

12   Q.  And when you would get up in the morning or come home at

13   night and you saw Josefina, would you say hello to her?

14   A.  Yes.

15   Q.  Would you address her as Josefina?

16   A.  No.  Everybody called her "Ma."

17   Q.  So you would call her "Ma"?

18   A.  Mm-hmm.

19   Q.  Because she was your mother?

20   A.  No.

21   Q.  You would call her "Ma"?

22   A.  Everybody called her "Ma."

23   Q.  Okay.  And, when you say everybody, who is everybody?

24   A.  Any friends, anybody who was around.

25   Q.  So you heard everybody, people that you can't even recall,

1    calling her Ma?

2    A.  Not everybody, literally, but like, people who were around,

3    like, friends who were around.

4    Q.  Now, can you explain -- how about William Drayton, did he

5    call Josefina "Ma" too?

6    A.  I don't recall.

7    Q.  He had his own mother though, right?

8    A.  Yes.

9    Q.  And you knew his mother?

10   A.  Not well.

11   Q.  You know her name was Maryanne?  Does that help refresh

12   your recollection?

13   A.  No.

14   Q.  Did you ever hear William Drayton refer to his mother?

15   A.  No.

16   Q.  Okay.  Now, you were played a message when the government

17   was directing you, which was -- you said was from -- that was

18   exhibit 111-16.

19        You said you recognized a 551 number as William

20   Drayton's number?

21   A.  Yes.

22   Q.  And in that message Drayton says to tell Josefina to leave

23   a pack out.

24        MR. FERGENSEN:  Objection, your Honor.

25        Mischaracterizing the evidence.  Mr. Rainey says that.

1        THE COURT:  All right.  Do you want to rephrase it or

2   just -- why don't you ask it maybe not as a leading question,

3   and then he can answer it.

4   Q.  Do you recall being asked about that message and

5   identifying the 551 phone number as William Drayton's?

6   A.  Yes.

7   Q.  Do you recall the content of that message that was

8   displayed on the screen in front of you?

9   A.  Yes.

10  Q.  Was the content of that message, sum and substance, to the

11  effect, tell him to have Josefina leave a pack out?

12  A.  Yes.

13  Q.  And "him" was referring to, in your testimony, Billy

14  Ortega?

15  A.  Yes.

16  Q.  And Josefina was referring to Josefina?

17  A.  Yes.

18  Q.  But she was not referred to as "Ma"; is that correct?

19  A.  No.

20  Q.  But I thought you were telling us earlier that everybody

21  referred to her as "Ma," except for William Drayton on that

22  message when he was telling you to tell Billy --

23        MR. FERGENSEN:  Objection, your Honor.

24        Again, mischaracterizing the evidence.  It was

25  Mr. Rainey who sent the message, not Mr. Drayton.

1    A.  I told him to tell -- I said, tell Josefina to leave a pack

2    out, so I didn't call her "Ma" in that text message.

3    Q.  Okay.  Now let me ask you about one of the other messages

4    that you just saw and we just went through.  This was a message

5    at Government's Exhibit 111-34, page 34 thereof, where this was

6    a message from Billy Ortega to you.

7         Do you recall that one?

8    A.  Yes.

9    Q.  And Billy said, go to the crib, something to that effect?

10   A.  Yes.

11   Q.  Is now crib, your understanding, as you recall this

12   message, was Josefina's apartment?

13   A.  Yes.

14   Q.  And give her what you made today, do you recall that part

15   of the message?

16   A.  Yes.

17   Q.  And that meant to you to give Josefina the money that you

18   had collected from your deliveries that day; correct?

19   A.  Yes.

20   Q.  Now Billy referred to his mother Josefina as "her," did he

21   not?

22   A.  Yes.

23   Q.  He did not say give Ma what you made today, did he?

24   A.  No.

25   Q.  Okay.  And it's still your testimony that everybody called

1    Josefina Ma; is that correct?

2    A.   Mostly; yes.

3    Q.   Mostly.  Now it's mostly.  Okay.

4         Now let's talk about your testimony, Mr. Rainey, where

5    you indicated that Josefina's role in Billy's drug business,

6    when she was not working and not in the hospital, and not

7    convalescing from cancer, her role when not involved in her

8    other life was to store the drugs for Billy's business in a

9    safe in the hallway closet.

10   A.   Yes.

11   Q.   How did the drugs get into the safe?  Were they delivered

12   to the house?

13   A.   They were brought to the house.

14   Q.   By who?

15   A.   I'm not sure.

16   Q.   So during the entire time that you lived there, you never

17   saw anybody bring drugs to the house?

18   A.   I don't recall directly.

19   Q.   Okay.  Did you tell the government that you recall drugs

20   being brought to the house and packaged in the kitchen on the

21   kitchen table?

22   A.   I recall telling them that.  I've seen it be packaged, but

23   not directly being brought to the house.

24   Q.   Okay.  And can you tell us -- excuse me, Judge.

25        Can you tell us about the safe that you saw in the

1    hallway closet.

2    A.  Yes.

3    Q.  What color was it?

4    A.  Gray, I think.

5    Q.  Did it have a combination lock or a fingerprint lock or a

6    key lock?

7    A.  It was a -- I believe it was a number pad.

8    Q.  And was the safe there in that closet the day that law

9    enforcement came into that I apartment and arrested you?

10   A.  I believe it was.

11   Q.  Now, the day that law enforcement came in and arrested you,

12   did you have any weapons on you?

13   A.  No.

14   Q.  Did you have any drugs on you?

15   A.  No.

16   Q.  Was your room searched?

17   A.  No.

18   Q.  Did you tell the government about the safe?

19   A.  Once I met with them, yes.

20   Q.  And are you aware that they went to Josefina's apartment to

21   look for that safe?

22   A.  Some time later, yes.

23   Q.  And you're also aware that they didn't find any safe in the

24   hallway closet; is that correct?

25   A.  Yes.

1   Q.  And did the government question you about the veracity of

2   what you had told them, having found out now that there is no

3   safe in the hallway in Josefina's apartment?

4   A.  Yes.

5   Q.  And what did you tell them?

6   A.  I don't know.

7   Q.  You said it must have been there.

8   A.  I don't know what happened to it.

9   Q.  Okay.  You said that also it was your testimony that

10  Josefina kept the money that was given to her in a safe in her

11  room; is that correct?

12  A.  Yes.

13  Q.  Did you ever go into her room and see the safe?

14  A.  Yes.

15  Q.  Was it a safe with a combination, a key pad, or a key?

16  A.  A key.

17  Q.  So it was a lockbox.

18  A.  Yes.

19  Q.  How big was it?

20  A.  Not too big; small.

21  Q.  There's a tissue box in front of the jury box.

22          Is it bigger than a tissue box?

23  A.  Yes.

24  Q.  The screen in front of you, is it bigger than the screen in

25  front of you?

1    A.   A little smaller.

2    Q.   Okay.  So it's somewhere the tissue box and the screen in

3    front of you.

4    A.   Yes.

5    Q.   And in that lockbox Josefina would keep the money that you

6    brought to her?

7    A.   Yes.

8    Q.   And did anybody else bring Josefina money?

9    A.   Other runners.

10   Q.   Okay.  Like who?

11   A.   Mike, Will.

12   Q.   Now, where did Will Drayton live?

13   A.   Across the street.

14   Q.   And who did he live there with?

15   A.   His mother.

16   Q.   And did Will Drayton keep money and drugs in his house?

17   A.   I believe so.

18   Q.   Was Will Drayton a drug dealer in his own right?  Did he

19   have his own drug distribution business?

20   A.   Yes.

21   Q.   So in addition to being a runner for Mr. Ortega, he also

22   had his own drug business.

23   A.   I believe so.

24   Q.   Did you work for him and his drug business?

25   A.   No.

O4aFmarH                    Rainey - Cross

1    Q.  Did you ever travel outside of New York City to distribute

2    drugs?

3    A.  No.

4    Q.  In connection with the drug business, did you ever travel

5    outside of New York City?

6    A.  No.

7    Q.  Did you ever go to California with William Drayton?

8    A.  Yes.

9    Q.  Why?

10   A.  Just vacation.

11   Q.  What was the nature of your relationship with Mr. Drayton?

12   A.  Platonic friends.

13   Q.  Not romantic?

14   A.  No.

15   Q.  So you and your platonic friend, Mr. Drayton, took a trip

16   to where?

17   A.  California.

18   Q.  And you didn't bring drugs with you?  You didn't buy drugs

19   while you were there?

20   A.  We bought some edibles and some weed and tried some stuff

21   out there.

22   Q.  And you came back.

23           And were you friendly, as well, with his mother?

24   A.  Drayton?

25   Q.  Yes.

1    A.  I didn't know his mother that well.

2    Q.  But you did tell us that there was a time that the drugs

3    were stashed in William Drayton's apartment and picked up from

4    his mother; is that correct?

5    A.  Yes.

6    Q.  And, do you recall any messaging around that period of time

7    where somebody would refer to his mother, Maryanne, as "Ma"?

8    A.  No.

9    Q.  Did William Drayton refer to his mother as "Ma"?

10   A.  Not that I can recall.

11   Q.  Okay.  So he referred to Josefina in the message that we

12   just saw as Josefina, but you don't know how he referred to his

13   mother.

14        MR. FERGENSEN:  Objection.  Again, mischaracterizing

15   the evidence.  It's not a text from Mr. Drayton.

16        THE COURT:  Can you answer that?  Is your recollection

17   that that text was from Mr. Drayton or from you?

18   A.  That text was from me.  I called her Josefina.

19        MR. RUSSO:  Okay.  I'm sorry.  Thank you, Judge.

20   Q.  Now, during the entire time that you lived with Josefina,

21   during the entire time that you were picking up drugs from her,

22   having her allegedly leave packs out for you, giving her money,

23   you never once had a text message with her?

24   A.  No.

25   Q.  Never once had a phone call with her?

1   A.  I've had phone calls with her.

2   Q.  When it came to picking up drugs or having drugs left for

3   you, it was always through Billy?

4   A.  Yes.

5   Q.  You never walked into the next room and knocked on the door

6   and said, Josefina, I need the pack?

7   A.  Yes.

8   Q.  You did that?

9   A.  Yes.

10  Q.  Okay.  So you didn't have to go through Billy?

11  A.  She had to go through Billy, so either way --

12  Q.  Well, why are there no text messages from Josefina to Billy

13  regarding leaving packs out.

14          Do you know that?  Have you ever seen any?

15  A.  They spoke on the phone.

16  Q.  Oh, okay.  And you never saw, the government never showed

17  you any messages or phone calls between Billy and his mother

18  for you to identify; is that correct?

19  A.  No.

20  Q.  And they never showed you any text messages or phone calls

21  between you and Josefina?

22  A.  No.

23  Q.  Is that correct?

24  A.  No.

25  Q.  So the only messages that you're testifying about are

1    messages between you and Billy or you and William Drayton; is

2    that correct?

3    A.   Yes.

4    Q.   Now, you were asked about Josefina's work.

5              And did you know where she worked?

6    A.   Yes.

7    Q.   Where did she work?

8    A.   Macy's.

9    Q.   And what did she do at Macy's?  Did you know?

10   A.   No.

11   Q.   Was she an executive, a salesperson, or a cleaning lady?

12   A.   I believe, a cleaning lady.

13   Q.   And during the entire time that you lived with Josefina,

14   did you ever see her buying expensive items?

15   A.   Not that I recall.

16   Q.   Did she have a car?

17   A.   No.

18   Q.   Did Billy have a car?

19   A.   He shared one with his girlfriend.

20   Q.   And have you ever been to Billy's house in New Jersey?

21   A.   Yes.

22   Q.   You took an Uber out there once; didn't you?

23   A.   Yes.

24   Q.   And you took an Uber out there to pick up two kilos of

25   drugs; is that correct?

1  A.  No.

2  Q.  And you didn't go out there and pick up two kilos, which

3  Billy told you to bring back to Drayton's house?

4  A.  No.

5  Q.  Because they were going to being picked up?

6  A.  I don't recall that.

7  Q.  Those weren't the kilos tainted with fentanyl?

8  A.  No.

9  Q.  And those weren't the kilos where you scooped out some

10  drugs from to sell on the side for yourself.

11  A.  That never happened.

12  Q.  And you didn't have any sort of a side drug business.  You

13  didn't have any customers of your own.

14  A.  Never.

15  Q.  You didn't sell any drugs to customers of Billy's without

16  Billy's knowledge?

17  A.  No.

18  Q.  Are you aware of somebody by the name of, or referred to by

19  the name Princess?  A gentlemen known by Princess?

20  A.  No.

21  Q.  Who lived in William Dayton's building?

22  A.  No.

23  Q.  Whose apartment was used as a second stash house for the

24  Ortega drug operation.

25  A.  No.

Q.  Now, isn't it a fact as you recall this, Mr. Rainey, that

Mr. Drayton's apartment, where his mother lived, on West 17th

Street, across the street from Josefina's apartment, was used

as the principal stash house for the drugs in the Ortega drug

operation?

A.  Can you repeat the question?

Q.  Isn't it true, Mr. Rainey, that the Drayton house, lived in

by his mother -- lived in -- I'm sorry.  Withdrawn.

          Isn't it true that the Drayton apartment on West 17th

Street, where his mother lived, was the primary stash house for

the Ortega drug operation?

A.  That's not true.

Q.  And isn't it also true that the apartment in the same

building as William Drayton's mother's apartment, occupied by

someone named Princess, was the secondary stash house for the

drug operation?

A.  I don't know anything about that.

Q.  Okay.  But you did know that you picked up drugs from

William Drayton's apartment for a period of time?

A.  Yes.

Q.  Now, do you know why?

A.  No, I don't.  I just know that the drugs were there.

Q.  Okay.  Even though you were close platonic friends with

Mr. Drayton and took trips to California with him, you had no

idea, you never had a conversation with him as to why all the

1    drugs were being picked up from his mother's apartment?

2    A.   No.

3    Q.   Now, Mr. Drayton's mother was never implicated in this

4    case.

5           Is that because you asked the government not to have

6    her arrested?

7    A.   No.

8    Q.   Is that because you did your level best not to implicate

9    her in this case?

10   A.   No.

11   Q.   Do you recall the period of time that you picked up the

12   drugs from Drayton's mother's house?

13   A.   No.

14   Q.   And you don't recall if Drayton's mother was referred to as

15   "Ma"?

16   A.   No.

17   Q.   Now --

18           THE COURT:  Sorry.  Just to clarify, do you have any

19   reason to believe that Drayton's mother was involved in selling

20   drugs?

21           THE WITNESS:  No.

22   Q.   When you went to pickup the drugs at his mother's

23   apartment, was she ever present?

24   A.   Yes.

25   Q.   Okay.  But she didn't know anything about the drugs.  Her

1  son was dealing for himself and the drugs he was couriering for

2  Billy Ortega?

3  A.  I'm sure she did.

4  Q.  She did.  And she permitted, then, her apartment to be used

5  to store drugs.

6  A.  I believe so.

7  Q.  Okay.  So that would be information, as to the judge just

8  asked you, that would implicate her in the drug business.

9           THE COURT:  I think you should clarify who the "her"

10 is.

11 Q.  Drayton's mother.

12 A.  Yes.

13          THE COURT:  Sorry.  I just want to make sure we're all

14 on the same page.  I'm just looking at the transcript here.

15          When the question is:  She did, and she permitted,

16 then, her apartment to be used to store drugs, who do you

17 understand the "she" to be in that sentence?

18          THE WITNESS:  Drayton's mother.

19          THE COURT:  So Drayton's mother allowed her apartment

20 to be used to store drugs.

21          THE WITNESS:  Yes.

22          THE COURT:  And do you know if she did that knowingly?

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  Thank you for clarifying that.

25

1    BY MR. RUSSO:

2    Q.  Now, just a few more questions Mr. Rainey.  Thank you.

3          During the time that you lived with Josefina, you know

4    that she worked.  You were asked what hours she worked.

5          Do you recall what her work schedule was?

6    A.  She worked during the day; I don't know exact hours.

7    Q.  And you don't recall that she worked 4 to 12, 3 to 11, at

8    night?

9    A.  She would usually be home by 8.

10   Q.  Okay.  So your recollection, your testimony is, Josefina

11   Marine would come home from work at 8 o'clock.

12          That never varied?

13   A.  Not really; no.

14   Q.  Including Saturdays, including Sundays?

15   A.  No.

16   Q.  Okay.

17          MR. RUSSO:  Give me one moment, please, your Honor.

18          THE COURT:  Sure.

19          MR. RUSSO:  I have nothing further, Judge.  Thank you.

20          THE COURT:  Thank you.

21          Any redirect?

22          MR. FERGENSEN:  No redirect, your Honor.

23          THE COURT:  Mr. Rainey, you can step down.  Thank you.

24          (Witness excused)

25          THE COURT:  Does the government intend to put on any

O4aFmarH

1    additional evidence at this hearing today?

2              MR. HERMAN:  Your Honor, as we indicated in our

3    letter, we would ask that the Court recognize that all the

4    exhibits that we produced to the Court and to the defense here

5    and admitted in Ortega's trial would be part of the record for

6    the Court to consider, and the transcript, or course, from the

7    trial.

8              THE COURT:  Mr. Russo, do you have any objection to

9    that?

10             MR. RUSSO:  To the exhibits that the government

11   disclosed to me yesterday afternoon?  No.

12             I don't know what the full breadth and scope of their

13   trial exhibits were.  If that list was inclusive of what was

14   produced at trial, I have no objections.

15             MR. HERMAN:  Just so the record's clear, we produced,

16   last week, all of our trial exhibits to Mr. Russo.

17             Yesterday, we produced, we marked a few exhibits that

18   are on the docket, including Ms. Marine's plea transcript, the

19   PSR, and the defense sentencing submission.

20             There was one additional phone exhibit which is a text

21   message exchange between Mr. Keven Quezada and Billy Ortega

22   that, should Mr. Quezada testify, we would offer, but that was

23   produced yesterday.

24             MR. RUSSO:  That's all fine, Judge.

25             My concern was, the testimony of Kareem Freckleton, if

1 the government is looking to have that stipulated in without an

2 opportunity to confront Mr. Freckleton, whose testimony was, I

3 guess, cumulative of Rainey's testimony, I would object to

4 that, because I think the purpose of the hearing today, Judge,

5 is to permit us to confront witnesses against Ms. Marine's

6 role.

7 So, if Freckleton's transcript is not part of what

8 they're looking for, I have no objection.

9 MR. HERMAN:  Your Honor, Special Agent Freckleton is a

10 DEA special agent.  He did not testify at the trial, so I'm not

11 sure why we're talking about that.

12 THE COURT:  Then, Mr. Russo, you don't otherwise have

13 an objection to my considering anything else from the trial.

14 MR. RUSSO:  Nothing, your Honor.

15 THE COURT:  Thank you.

16 You can call your first witness, Mr. Russo.

17 MR. RUSSO:  Judge, before I do that, I have been

18 advised -- and that's why I spoke with Mr. Seidler, briefly --

19 that Mr. Ortega has elected not to testify today.

20 I certainly respect his right, after consulting with

21 his attorney, although, I'm somewhat at a loss, because I spoke

22 to him yesterday.

23 That being said, the only witness I would have to call

24 is Ms. Marine, who I guess is ready whenever she could be

25 brought up.

O4aFmarH

 1          THE COURT:  We're ready right now.  Thank you.

 2   JOSEFINA MARINE,

 3        called as a witness by the Defendant,

 4        having been duly sworn, testified as follows:

 5          MR. RUSSO:  Okay.

 6          THE COURT:  Before we proceed, I do want to advise

 7   Ms. Marine about her right under the Fifth Amendment.

 8          Is it the government's position that I need to tweak

 9   the proposed warning in any way for Ms. Marine?  She's not yet

10   been sentenced, and I'm aware of law to the effect that the

11   Fifth Amendment privilege against self-incrimination survives

12   the guilty plea and will not be considered waived until the

13   defendant's sentence is final.  The Second Circuit, I believe,

14   held as much as well, but I wanted to get your thoughts on if I

15   needed to tweak the language proposed in any way.

16          MR. HERMAN:  We agree with that as our understanding

17   of the law, as well, your Honor, and we think the proposed

18   allocution is accurate.

19          There is a section that would have applied to

20   Mr. Ortega.  He was sentenced; obviously, Ms. Marine has not,

21   and therefore, the language for him would still apply.  There

22   is a section about a different crime.  For Marine, it would

23   certainly encompass the current charges, as she has not been

24   sentenced.

25          And the basis for that, as the Second Circuit has

1    recognized, she could implicate herself in things that could

2    lead to a sentencing guideline enhancement and, therefore,

3    would certainly retain the Fifth Amendment right on that basis.

4         THE COURT:  All right.  Ms. Marine, before you

5    testify, I'm going to advise you of the following.  You have

6    the right, under the Fifth Amendment to the United States

7    Constitution, not to give any testimony if you have a

8    well-founded fear that the testimony may tend to incriminate

9    you of a crime, whether a federal crime or a state crime.

10        Do you understand that?

11        THE DEFENDANT:  Yes.

12        THE COURT:  And here, even though you pled guilty to a

13   federal crime in this matter, that does not mean that you no

14   longer have a Fifth Amendment right not to testify, because as

15   the government just noted, among other things, it could affect

16   your sentence.

17        Do you understand that?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Of course, it is your decision and your

20   decision alone whether to testify.  I am not in any way

21   suggesting that you should or should not testify.  I simply

22   want to make sure that you fully understand your rights and

23   that you've had a chance to discuss them with your attorney.

24        Do you understand that?

25        THE DEFENDANT:  Yes.

O4aFmarH

1          THE COURT:  Do you wish to speak with your attorney

2    further?

3          THE DEFENDANT:  Yes.

4          THE COURT:  You do want to speak with him further

5    before you testify?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Mr. Russo, do you want to come up?

8          MR. RUSSO:  Sure, Judge.

9          THE COURT:  And if you need more privacy, let me know.

10         And just to clarify, do we all agree -- I mean, I'll

11    continue with the remaining questions, but do we all agree that

12    that was the proper warning?

13         MR. HERMAN:  We do, your Honor.

14         THE COURT:  Thank you.  Okay.

15         (Defendant conferred with counsel)

16         MR. RUSSO:  Judge, we're fine, your Honor.

17         THE COURT:  So Ms. Marine, now that you've spoken

18    further with your attorney, do you wish to knowingly and

19    voluntarily waive your right not to incriminate yourself and to

20    testify at this hearing today?

21         THE DEFENDANT:  Yes.

22         THE COURT:  And have you discussed with your attorney

23    your decision to knowingly and voluntarily waive your right not

24    to incriminate yourself and to testify in this matter today?

25         THE DEFENDANT:  Yes.

1           THE COURT:  Are you satisfied with the representation

2    your attorney has provided in this matter?

3           THE DEFENDANT:  Yes.

4           THE COURT:  All right.

5           You may proceed, Mr. Russo.

6           MR. RUSSO:  Judge, thank you.

7    DIRECT EXAMINATION

8    BY MR. RUSSO:

9    Q.  Hi, Josefina.  Who called you "Ma"?

10   A.  (In English) Nobody.

11   Q.  You have two of your children sitting in the courtroom?

12   A.  Yes.

13   Q.  What about Melanie, what did Melanie call you?

14   A.  (In English) Mami.

15   Q.  How about Keven?

16   A.  (In English) Mami.

17   Q.  About how Billy, your other son who is not here?

18          MR. RUSSO:  I'm sorry.  I'll go slower.

19          THE COURT:  Yeah, if you could.  Thank you for raising

20   that.  Just slow down that give the interpreter the time to

21   translate, please.

22   Q.  How about Billy, what did he call you?

23   A.  Mami.

24   Q.  Now when you say that your three children, who we just

25   identified, all called you "Mami," does this apply to their

1   entire lives?

2   A.   Whole lives.

3   Q.   And you've been detained in the Metropolitan Detention

4   Center for some months now; is that correct?

5   A.   Yes.

6   Q.   And you've had a number of phone calls with your daughter,

7   Melanie?

8   A.   Yes.

9   Q.   A number of phone calls with your son, Keven?

10  A.   Yes.   Uh-huh.

11  Q.   Have either of them ever called you "Ma" over the phone at

12  the MDC?

13  A.   No.   No.

14  Q.   Now, let's talk about Mr. Rainey.

15          What did he call you?

16  A.   Josefina.

17  Q.   He didn't call you Mami, did he?

18          THE COURT:  You just have to give the interpreter time

19  to translate.

20  Q.   How about William Drayton, you know William Drayton?

21  A.   Yes.

22  Q.   How do you know him?

23  A.   A friend of Keven's.

24  Q.   What did he call you?

25  A.   Josefina.

1    Q.  Just like -- withdrawn.

2            Where did you live before all of this happened?

3    A.  418 West 17th.

4    Q.  What apartment?

5    A.  3H.  Yes, 3H.

6    Q.  Is that the apartment that your daughter, Melanie, lived in

7    and your son, Keven?

8    A.  Yes.  Yes.

9    Q.  And is that the apartment that Rainey moved into when

10   Melanie moved out?

11   A.  No.

12   Q.  Which apartment is it that Rainey moved into when Melanie

13   moved out?

14   A.  At 431 West 17th, Apartment 4E.

15   Q.  Okay.  And that is your apartment?

16   A.  Yes.  Yes.

17   Q.  And who did you live there with?

18   A.  Keven.

19   Q.  Between 2018 and 2022?

20   A.  At 431.

21   Q.  That's apartment 4E.

22   A.  Yes.

23   Q.  Now, you heard Mr. Rainey tell us, as he has for some time,

24   that you kept is safe in the hallway closet.

25   A.  I've never seen a safe.

1   Q.  You're certain, as you testify here under oath, Ms. Marine,

2   that you've never had a safe in the hallway closet in your

3   apartment?

4   A.  No.

5   Q.  How about a lockbox in your bedroom?

6   A.  Yes.  Yes.

7   Q.  Tell us about the lockbox in your bedroom.

8          What did you keep in that?

9   A.  I kept my paperwork and sometimes I kept money for the

10  bills there.

11  Q.  Who would bring you money that you would put in the

12  lockbox, if anyone?

13  A.  Kaylen.

14  Q.  And how about Mr. Drayton, William Drayton?

15  A.  He brought me money two times.

16  Q.  Now, let me focus you on the period of time, January 2019

17  through June of 2022.

18         Okay?

19  A.  Uh-huh.

20  Q.  Were you working?

21  A.  Yes.

22  Q.  And were you working?

23  A.  34 Herald Square, Macy's.

24  Q.  And what was your job at Macy's?

25  A.  Housekeeping.

1    Q.  What does housekeeping entail, Ms. Marine?

2    A.  Picking up shoe boxes, cleaning the restrooms.

3    Q.  And as you sit here today, are you certain in your

4    recollection of your days and hours worked?

5    A.  Yes.

6    Q.  Without guessing, can you tell the judge what days and

7    hours you worked during that period of time?

8    A.  From 1 to 9:30 p.m.  My days off were Sunday and Wednesday.

9    Q.  And how about Fridays and Saturdays, what were your hours?

10   A.  The store closes down earlier.  It closes down at 10 p.m.

11            THE INTERPRETER:  Interpreter correction.  It closes

12   down later.  It closes at 10 p.m.

13   Q.  So what were your hours of work on Fridays and Saturdays?

14   A.  From 1 to 10.

15   Q.  Now, did that ever vary or were those your regular hours?

16   A.  Regular.

17   Q.  Now, it's fair to say that during that period of time,

18   beginning in May of 2019 and then going through 2020, with the

19   pandemic, that you weren't always working; is that correct?

20   A.  Yes.

21   Q.  What happened in May of 2019?

22   A.  They discovered I had cancer.

23   Q.  And can you describe for us what happened in your life

24   after you were diagnosed with cancer in May of 2019?

25   A.  Well, depression, and after that, it was on to the

1   operation.

2   Q.  When did you have the operation?

3   A.  July 23 of 2019.

4   Q.  And how long were you in the hospital?

5   A.  Four days.

6   Q.  And after those four days, where did you go?

7   A.  Home.

8   Q.  And what were you doing at home?

9   A.  Nothing.  I had to be looked after, because I couldn't get

10  up from bed.

11  Q.  For how long after you returned home were you in bed

12  recuperating?

13  A.  Well, I was to be at home for three months.

14  Q.  And who was caring for you, if anyone, during that period

15  of time?

16  A.  My husband and my son, Keven.

17  Q.  And between July of 2019 and the three or four months that

18  followed, who was answering the door to distribute drugs?

19  A.  No drugs were distributed in my house.

20  Q.  And how about money?  Did you collect any money from Rainey

21  during that period of time that you were recuperating?

22  A.  It's not that he would bring me money every day.  Sometimes

23  a month or two months would go by.

24  Q.  During the period of time that you're in bed recuperating

25  from your cancer operation, was Rainey still bringing you money

1    on a regular basis.

2    A.   No.

3    Q.   Was anyone else bringing money to the house?

4    A.   No.

5    Q.   Was Rainey, during the last six months now, now we're

6    talking about May 2019 through December 2019, was Rainey still

7    living in the apartment with you?

8    A.   Yes.

9    Q.   And who else was living in the apartment with you?

10   A.   Keven.

11   Q.   When you got home from the hospital, was there a period of

12   time that Rainey left the house?

13   A.   Rainey would leave.  He would take off on vacation for

14   three weeks.  I mean, I didn't pay him any mind.

15   Q.   Now, at some point you went back to work following the

16   recuperation from your cancer surgery.  When was that?

17   A.   Around November.

18   Q.   And did you go back to your regular work schedule?

19   A.   Yes.

20   Q.   Now, did that change in January of 2020?

21   A.   Yes.

22   Q.   Why?

23   A.   Because I had my second surgery on January 31st where I was

24   going to have a nipple put on.

25   Q.   And how long were you out of work for that surgery and the

1   subsequent recuperation?

2   A.  One month.

3   Q.  And where were you during this one month following the

4   January 2020 surgery?

5   A.  At home.

6   Q.  Now, do you recall returning to work a month later, in

7   February of 2020?

8   A.  No, in March.

9   Q.  And you returned to in March.  For how long were you back

10  at work?

11  A.  On the same day that I returned to work, that same day, the

12  store was getting shut down.

13  Q.  Why was it getting shut down?

14  A.  Due to COVID.

15  Q.  Okay.  Now, from the period of January 1, 2020, through the

16  time that the store shut down for COVID, was Rainey still

17  living in the house?

18  A.  Yes.  He was living at the house, but then due to COVID, I

19  think he went to live with his family for two months.

20  Q.  And where was that?

21  A.  In Buffalo, I think.  I'm not sure.

22  Q.  And which two months did he go to live with his family in

23  Buffalo?

24  A.  When COVID started.

25  Q.  So let's take the January, February, March, April, and May

1    of 2020.  During that period of time, was anybody bringing

2    money to you?

3    A.   Keven, my son, was collecting the rent money for the house,

4    from his girlfriend and from Billy.

5    Q.   And for Billy's girlfriend or for Keven's girlfriend?

6    A.   Billy's girlfriend who had a house in the Bronx.

7    Q.   So Billy and his girlfriend had a house in the Bronx, which

8    was rented, and Keven would collect the rents?

9    A.   Yes.

10   Q.   Did anybody else bring you money during that period of

11   time?

12   A.   No.

13   Q.   And again, during that period of time, there was not a safe

14   in the hallway closet which contained drugs.

15   A.   No.

16   Q.   Now, did you ever, in the whole time that you've lived in

17   that apartment, ever see anybody in the kitchen packaging up

18   drugs?

19   A.   Never.

20   Q.   Any place else in the house that you might have seen drugs?

21   A.   No.

22   Q.   How about guns?  You ever see any guns in your house?

23   A.   Never.

24   Q.   Do you know whether or not Rainey ever visited Billy in New

25   Jersey?

O4aFmarH                    Marine - Direct

1    A.   Yes.

2    Q.   And tell us about that.

3    A.   He would visit him from time to time.

4              THE COURT:  I just want to step back for a second.

5              So did you ever see drugs in your house?

6              THE WITNESS:  No.

7              THE COURT:  Did you ever have a safe in the hallway?

8              THE WITNESS:  No.

9              THE COURT:  Did you ever have a safe in your bedroom?

10             THE WITNESS:  No.  The one I have is the one with a

11   key.

12             THE COURT:  And where was that?

13             THE WITNESS:  In my room.

14             THE COURT:  What did you do that led you to plead

15   guilty to this crime?  Like, what conduct were you involved

16   with that makes you believe that you are guilty of the crime to

17   which you pled guilty?

18             THE WITNESS:  Because I was storing money, and I

19   didn't know what it was from.

20             MR. RUSSO:  I'm sorry, Judge.

21             THE COURT:  No.  Go ahead.

22   BY MR. RUSSO:

23   Q.   Would it be fair, Josefina, to say that you didn't know but

24   should have known where the money came from?

25   A.   Uh-huh.

1   Q.  Referring to the money that Rainey would drop off and the

2   couple of times you say Drayton dropped off money.

3   A.  Yes.

4   Q.  Were you home when either of the two times that the

5   government agents came and searched your apartment?

6           MR. HERMAN:  Objection, your Honor.

7           It's leading, and it's also incorrect, factually.

8           THE COURT:  Why don't you rephrase the question,

9   please.

10  Q.  Do you know whether or not government agents ever came in

11  and searched your apartment?

12  A.  Yes.

13  Q.  How many times?

14  A.  Once.

15  Q.  Were you home at the time?

16  A.  Yes.

17  Q.  Did they find the safe in the hallway closet when they

18  searched your apartment?

19  A.  No.

20  Q.  Why not?

21  A.  Because there was no safe.

22  Q.  How about the safe in your bedroom with -- or the lockbox

23  in your bedroom that you described.  Did they find that?

24  A.  Yes.

25  Q.  Did you open it for them?

1    A.  Yes.  Uh-huh.

2    Q.  Money and drugs inside?

3    A.  No.

4    Q.  Thank you, Josefina.

5           MR. RUSSO:  I have nothing further, Judge.

6           THE COURT:  Cross-examination.

7           MR. HERMAN:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MR. HERMAN:

10   Q.  Good morning, Ms. Marine.

11   A.  Good afternoon.

12   Q.  Ms. Marine, Billy Ortega is your son; correct?

13   A.  Yes.

14   Q.  And he was a drug dealer; right?

15   A.  I didn't know he was.

16   Q.  You had no idea that he was a drug dealer?

17   A.  Earlier, no.

18   Q.  Mr. Ortega didn't live with you.  He lived in New Jersey,

19   as you testified; correct?

20   A.  That's right.

21   Q.  And you live in a large house; right?

22   A.  Yes.

23   Q.  And he paid for that house with drug money; right?

24   A.  I don't know.

25   Q.  Billy Ortega wasn't working; right?

1    A.  No.

2    Q.  In fact, he collected supplemental Social Security income;

3    correct?

4    A.  Yes.

5    Q.  That's money that's meant for people without financial

6    means; right?

7    A.  Mm-hmm.

8    Q.  Is that a yes or no?

9    A.  I don't know if he had money or not.

10   Q.  Well, we wore nice clothes; correct?

11   A.  Normal clothing.

12   Q.  He had jewelry, including diamonds and gold?

13   A.  I saw -- I just saw one necklace once.

14   Q.  And he lived in a large house?

15          THE INTERPRETER:  The interpreter said necklace.  She

16   should have said chain.

17          MR. HERMAN:  Okay.

18   Q.  And he lived in a large house?

19   A.  He and his girlfriend.  The house was in his girlfriend's

20   name.

21   Q.  But he didn't live with you; correct?

22   A.  No.

23   Q.  In fact, he hasn't lived with you for a long time; correct?

24   A.  No.  It wasn't that long.  When we lived at 418, he lived

25   there.

1  Q.  Now, your apartment in what's known as the Fulton Houses in

2  Manhattan; is that correct?

3  A.  That's right.

4  Q.  And that's public housing.  In other words, it's part of

5  the New York City Housing Authority's housing project; correct?

6  A.  That's right.

7  Q.  And in order to qualify for housing, you have to not make a

8  lot of money; is that correct?

9  A.  Mm-hmm.

10  Q.  And in order to continue living or obtain such housing, you

11  have to tell the government that you don't have a lot of money;

12  right.

13  A.  You have to take the pay stubs from work.

14  Q.  And you also have to tell the government who lives in that

15  house; correct?

16  A.  Yes.

17  Q.  And you told them, you told the government, in order to

18  continue living in your apartment, that Billy Ortega lived with

19  you; correct?

20  A.  Yes.

21  Q.  And that's not true; correct?

22  A.  That's correct.

23  Q.  So you lied to the government.

24  A.  Yes, because I said he was living there, and he wasn't.

25  Q.  And when Mr. Rainey moved in with you, you never told the

1    housing authorities that he was living there; correct?

2    A.  No.

3    Q.  Even though you were required to do so in order to add him

4    to the lease; correct?

5    A.  Yes.

6    Q.  And instead, he paid you cash for rent; correct?

7    A.  Yeah, 630.

8    Q.  And you kept that money; correct?

9    A.  Yes.

10   Q.  Now, Keven Quezada is also your son; correct?

11   A.  Yes.

12   Q.  Ms. Quezada, just like Mr. Ortega, also sold drugs; right?

13   A.  No.

14   Q.  Melanie Quezada is your daughter; correct?

15   A.  Yes.

16   Q.  At one point in time, she lived with you; right?

17   A.  Yes.

18   Q.  At a certain point thereafter, she moved out, and at a

19   certain point after that, Mr. Rainey moved in; is that correct?

20   A.  Yes.

21   Q.  Now, Mr. Rainey worked for Billy Ortega's drug business

22   after he moved in; correct?

23   A.  I didn't know that they were doing that stuff with drugs.

24   Q.  Other people worked for Billy Ortega too, including your

25   other son, Keven Quezada; correct?

1   A.  No, sir.

2   Q.  Michael Novoa worked for Billy Ortega's drug business;

3   correct?

4   A.  I don't know who Michael is.

5   Q.  Do you know someone by the name of Jorge Ramos Cruz?

6   A.  No.

7   Q.  What about William Drayton you know him, right?

8   A.  Yes.

9   Q.  And he also worked for Billy Ortega's drug business;

10  correct?

11  A.  After I heard about this, then I understood that he was

12  working.

13  Q.  So prior to Mr. Drayton's arrest, you didn't know he worked

14  for Billy Ortega.  Is that your testimony today?

15          INTERPRETER:  For the interpreter, could you please

16  repeat the question.

17          MR. HERMAN:  Of course.

18  Q.  You are aware that William Drayton was arrested in 2022;

19  correct?

20  A.  Yes, after they arrested Kaylen and my son.

21  Q.  Prior to that, did you know that William Drayton was

22  working for Billy Ortega's drug business?

23  A.  No.  I didn't know.

24  Q.  Now Billy Ortega used a fake name to run his drug business;

25  correct?

1   A.  I don't know.

2   Q.  In other words, he didn't tell his customers, my name is

3   Billy Ortega; would you like to buy some cocaine; correct?

4   A.  I don't know.

5   Q.  He used another name in order to hide his identity to

6   prevent his criminal conduct from being exposed; correct?

7   A.  I don't know what name he used.

8   Q.  And the name he used was Jason.  You knew that; right?

9   A.  No.

10          MR. HERMAN:  Mr. Frenchman, Government Exhibit 112-5.

11          And can you zoom in on the two contents.

12  Q.  Ms. Marine, this is from your phone, the contacts from your

13  phone.  The top one says, Bolly My Son.

14          Do you have a son Billy, which is very similar to

15  Bolly?

16  A.  Billy Ortega is my son.

17  Q.  And the phone number associated with that contact ends in

18  5555.  That was one of Billy Ortega's phone numbers; correct?

19  A.  I don't remember very well.

20  Q.  You have another contact in your phone that says Jason, my

21  son; correct?

22  A.  I don't remember.

23  Q.  Ms. Marine --

24  A.  I always put Billy my son.

25  Q.  You don't have a son named Jason; correct?

1    A.  Of course not.

2    Q.  But you have a contact in your phone, Jason, my son, with a

3    phone number ending in 7055; correct?

4    A.  I don't remember the numbers, because I didn't have them

5    memorized.

6    Q.  And you credited a contact, Jason, my son, because that's

7    the name that your son Billy used in his drug business?

8            MR. RUSSO:  Objection; that's not what she said.  She

9    said she doesn't recall.

10           THE COURT:  I'll let her answer.

11           THE WITNESS:  I don't know.

12           MR. HERMAN:  Mr. Frenchman, can you keep this exhibit

13   up and also put up Government Exhibit S2, and just blow up the

14   first paragraph.

15   Q.  Now, Ms. Marine, do you see the text on your screen that

16   indicates that the two phone numbers we've just been looking at

17   on your phone, one ending in 7055 and one ending in 5555, were

18   assigned the same telephone, which was seized on February 1,

19   2022, from 95 Wooley Road, West Milford, New Jersey?

20           Do you see that, Ms. Marine?

21           MR. RUSSO:  Objection, Judge.  He's asking the witness

22   to read a portion of an exhibit.  I'm not sure what the point

23   is.

24           THE COURT:  I mean, do you really want to ask her

25   about this, or do you just want to make the point to me?  Do

O4aFmarH                    Marine - Cross

1   you want it translated to her?  How do you want to go about

2   this?

3           MR. HERMAN:  Your Honor, it's a fair point.

4           THE COURT:  Okay.

5           MR. HERMAN:  Obviously, it's not a jury trial.

6           THE COURT:  Right.

7           MR. HERMAN:  And obviously the Court is the fact

8   finder here.

9           THE COURT:  Right.

10          MR. HERMAN:  So I would like to emphasize for the

11  Court that both contacts, Bolly My Son, and Jason My Son, saved

12  in Ms. Marine's phone, were two numbers assigned to the same

13  phone that was seized from Mr. Ortega's phone on the date of

14  his arrest.

15          THE COURT:  Thank you.  And the witness need not

16  answer the question.

17          MR. HERMAN:  Thank you, your Honor.

18          You can take those exhibits down, Mr. Frenchman.

19  BY MR. HERMAN:

20  Q.  Now, Ms. Marine, you pled guilty in this case; correct?

21  A.  That's right.

22  Q.  And in order to plead guilty, you had to come to court,

23  this very courtroom, and answer a number of questions under

24  oath from Judge Abrams.

25          Do you remember that?

1   A.  Yes.

2   Q.  And, under oath means that you're swearing to tell the

3   truth, and if you lie, you could expose yourself to criminal

4   liability.  Do you understand that?

5   A.  Yes.

6   Q.  Just like you are under oath now; correct?

7   A.  That's right.

8            MR. HERMAN:  Mr. Frenchman, can you please publish

9   Government Exhibit 1101, which is the transcript of the guilty

10   plea proceeding.  It's also found at Dkt. No. 189 of this case,

11   as indicated at the header of the document.

12            Mr. Frenchman, can you please go to the page 26.

13            Can you please blow up lines 2 through 4?

14   Q.  Ms. Marine, I'm going to read this to you.  The Court,

15   Judge Abrams, asked you during that proceeding:  So Ms. Marine,

16   did you agree with at least one other person to distribute

17   narcotics.  And then the transcript says, the defendant, that's

18   you, answered, yes.

19   A.  Because I didn't know what they were talking to me about.

20            THE COURT:  You didn't know what who was talking to

21   you about, what I was talking to you about?

22            THE WITNESS:  Yes, what I didn't understand well when

23   I pled guilty.

24            THE COURT:  You didn't understand what?

25            THE WITNESS:  That I was pleading guilty.

1          THE COURT:  You did not understand that you were

2     pleading guilty?

3          THE WITNESS:  Yes.  Because I was storing money.

4          MR. RUSSO:  Your Honor, I think, if I may, this

5     snippet is cute, except that the context of the plea, we -- I

6     have it and we recall -- the Court will recall, we had to go

7     through the concept of conspiracy first.  That was what was the

8     holdup with my client was.

9          THE COURT:  She also said, on page 23, during some

10    parts of 2018 until 2022, I participated in a conspiracy to

11    distribute narcotics here in Manhattan.

12         THE WITNESS:  Yes, because I was storing money.

13         THE COURT:  Did you know what the money was for?

14         THE WITNESS:  At first I didn't, now I do know it was

15    for drugs.

16         THE INTERPRETER:  Interpreter correction, it was from

17    drugs.

18         THE COURT:  Mr. Russo, can you just explain to me, I

19    just want it to be clear if she's trying to not to -- if she's

20    trying to withdraw her plea, if she's saying that she didn't

21    have the requisite intent, I mean, what was her intent to join

22    a conspiracy?

23         I'll ask you, but I'll ask her as well.

24         MR. RUSSO:  Judge, I read the entire transcript of her

25    plea, and I know we had some bumps in it.  My client was clear

1  in her plea, I think.  She pled guilty to participating in the

2  charged conspiracy.  Her role therein was, she took money,

3  which she knew or should have known were drug proceeds.  That

4  is a valid plea.  It was a valid -- I'm sorry, Judge.

5           THE COURT:  So again, Ms. Marine, did you know that

6  the money came from the illegal sale of narcotics?

7           THE WITNESS:  At first, I didn't.

8           THE COURT:  But during the course of your conduct, did

9  you know that the money came from the sale of narcotics?

10          THE WITNESS:  No.  After they arrested my son, that's

11  when I knew.

12          THE COURT:  Okay.  And should you have known that the

13  drugs came from narcotics, in your view?

14          THE WITNESS:  I should have.

15          THE COURT:  Why?

16          THE WITNESS:  Because I was taking the money, and I

17  didn't ask him where it was coming from.

18          Keven picked up the money from the house where his

19  girlfriend rented a room.

20          THE COURT:  So, look.  I'm going to let you

21  Mr. Herman, continue your cross-examination, but I do want to

22  examine this question further about whether Ms. Marine is even

23  admitting, at this point, to the conduct with which she was

24  charged.

25          I'm going to read some language that the *Torres* case.

1   "Proof that the defendant engaged in suspicious behavior

2   without proof that he acknowledged that his conduct involved

3   narcotics is not enough to support his conviction for

4   conspiracy to traffic in narcotics."  Proof that the defendant

5   knew that some crime would be committed is not enough, and I

6   don't even know that we have that last line that I read.

7           I want to hear you out on that.  It doesn't need to be

8   at this moment, if you'd rather address it later.

9           MR. HERMAN:  Judge, the allocution was sufficient.  If

10  the defendant later, now, seeks to withdraw her guilty plea --

11  it doesn't sound like she is, but if she is explicitly seeking

12  to do so, the Court should reject that.

13          THE COURT:  Look, she did very clearly -- and you just

14  put it up on the screen; I have it in front of me -- say that

15  she agreed with at least one other person to distribute

16  narcotics.  She admitted that.

17          MR. HERMAN:  Yes, your Honor.

18          Judge -- one second, your Honor.

19          (Counsel conferred)

20          MR. HERMAN:  And, the purpose of this line of cross,

21  your Honor, is to demonstrate that Ms. Marine is lying to the

22  Court today, and she's doing it --

23          UNIDENTIFIED SPEAKER:  She's not lying.  She's not

24  lying.

25          THE COURT:  Excuse me.  If you interrupt this

1    proceeding one more time, I'm going to have one of the court

2    security officers take you out of the courtroom, so you are on

3    notice.

4              You may proceed.

5              MR. HERMAN:  All right.

6              THE COURT:  You may proceed.

7              MR. HERMAN:  I can move to a different topic.

8              THE COURT:  It's fine.  You're free to continue along

9    these lines, but you're also free to go elsewhere.  It's up to

10   you.

11             MR. HERMAN:  Thank you your Honor.

12             One moment, your Honor.

13             THE COURT:  Yeah.

14             (Counsel conferred)

15   BY MR. HERMAN:

16   Q.   Ms. Marine, you just heard, a moment ago, somebody yell out

17   in the courtroom; correct?

18   A.   Mm-hmm.

19   Q.   That's your daughter, Melanie Quezada; correct?

20   A.   Yes.

21   Q.   Your daughter believes you committed no wrongdoing in this

22   case; correct?

23             MR. RUSSO:  Objection, your Honor.

24             How does she know what her daughter thinks?

25             THE COURT:  Sustained.

1          MR. HERMAN:  I'll rephrase.

2     Q.  Ms. Marine, did you read the PSR in this case, in other

3     words, the presentence investigation report?

4     A.  No.  I didn't read it.

5     Q.  Have you received a copy of it?

6     A.  No.  They told me.  I didn't get a copy.

7     Q.  Obviously we discussed that you pled guilty in this case;

8     correct?

9     A.  Yes.

10    Q.  And when you did so, you were allocuted, or Judge Abrams

11    asked you questions where she asked if you are pleading because

12    you are, in fact, guilty; correct?

13         MR. RUSSO:  Judge, is he asking her about the PSR or

14    is he asking her about her allocution where she pled guilty?

15    BY THE COURT:  Could you clarify that, please?

16    Q.  I'm asking you about your allocution, your guilty plea

17    proceeding in this courtroom.

18    A.  Yes.  I was told that I had to say that I was guilty about

19    that.

20    Q.  It's not that you had to.  You said you were guilty because

21    you are guilty; correct?

22    A.  Because I was storing money that wasn't --

23    Q.  Now, are you aware that your daughter told probation, in

24    the presentence report, that you committed no wrongdoing?

25         MR. RUSSO:  Objection, your Honor.

1          What's the relevance of what her daughter may have

2     told pretrial?

3          THE COURT:  Sustained.

4     Q.  You've never admitted to your daughter that you're guilty;

5     correct?

6     A.  Uh-huh.

7          MR. RUSSO:  Again, Judge, what's --

8          THE COURT:  Overruled.

9     Q.  You're hiding, even right now, from your daughter, what you

10    did; correct?

11         MR. RUSSO:  Objection, Judge.  How is it relevant

12    whether or not Ms. Marine --

13         THE COURT:  It's relevant if she lies to people.  It's

14    relevant to her veracity.

15         You can answer the question.

16    BY MR. HERMAN:

17    Q.  The question is, you're hiding what you did in this case,

18    to your daughter, even right now; correct?

19    A.  My daughter knows that I accepted responsibility for the

20    money.

21    Q.  You don't want your daughter to know what you really did;

22    right?

23    A.  I haven't done anything.

24    Q.  Now, Ms. Marine, is it your testimony that you never

25    touched a bag of drugs at your apartment?  Is that your

1  testimony?

2  A.  Yes.

3  Q.  Not a single time did you touch a bag of drugs for your

4  son, Billy Ortega.  Is that your testimony?

5          THE INTERPRETER:  Pardon for the interpreter.

6          "Or" your son or "for" your son?

7  Q.  For your son.

8  A.  No.

9          MR. HERMAN:  Mr. Frenchman, can you please publish

10 Government Exhibit 101-17 at page 711?  If you could blow up

11 the bottom blue, it's the bottom blue one.

12 Q.  Now, Ms. Marine, this is a text exchange between -- well,

13 you were here when Mr. Rainey testified; correct, Ms. Marine?

14 A.  Yes.

15 Q.  And did you hear him testify that the phone number at the

16 top here, beginning with the area code 551 and that is listed

17 as Will's now number sign, is William Drayton's number?

18 A.  No.

19 Q.  And this is a text from that number to the phone number

20 ending in 5555, which is the same phone number saved in your

21 phone as Bolly My Son; correct?

22 A.  Billy.

23 Q.  Okay.  Now, this text message from Mr. Drayton to your son,

24 Billy says, send me all the information and tell your mom I'll

25 be there in five minutes.

1      You, of course, are Billy's mom; correct?

2   A.  Yes.

3   Q.  Billy doesn't have a second mom; correct?

4   A.  No.

5          MR. HERMAN:  Can we go to the next page,

6   Mr. Frenchman.

7   Q.  And you can see the next text now from your son, Billy, to

8   Mr. Drayton is an address and then a direction to, go now; he's

9   out by 9:30; correct?

10  A.  What do you say, I don't see clearly.

11  Q.  Okay.  The next message, obviously everyone in the

12  courtroom can see it.  If you can't see it, we can zoom in

13  more, but it's an address that Billy sends to Drayton after

14  Mr. Drayton tells Billy to send him the information and to tell

15  your mom about it, that he'll be there.

16         MR. RUSSO:  Judge, he's asking this witness to testify

17  to text messages that she's not a party to.

18         THE COURT:  Is there a question?

19         MR. HERMAN:  Let me move on, your Honor.

20         THE COURT:  Okay.

21         MR. HERMAN:  Let's go to Government Exhibit 116 at

22  page 3.

23         And just -- yeah, just blow this up.

24  BY MR. HERMAN:

25  Q.  So we looked at this earlier.  This is a text between

1    Drayton and Rainey.  Drayton says, you want to do today, and

2    Rainey says, just tell him make sure Josefina leave a pack out.

3            Josefina is your first name; correct?

4    A.  Yes.

5            MR. HERMAN:  All right.  Thank you, Mr. Frenchman.

6    Q.  Now, on direct examination, you testified that nobody

7    called you "Ma."  Is that correct?  Is that your testimony?

8    A.  Yes.  That's right.

9    Q.  When speaking with your own children, you said they called

10   you Madre or Mami; is that correct?

11   A.  No.  I said that they call me Mami.

12   Q.  Okay.  You don't know what they said when they were

13   speaking with other people about you, do you?

14   A.  No.

15           MR. HERMAN:  Your Honor, at this point the government

16   would like to display what has been marked as Government

17   Exhibit 101-22, which is that one exhibit that, obviously,

18   defense had no objection to that I mentioned earlier.

19           THE COURT:  Go ahead.

20           MR. HERMAN:  Can you go to page 31, Mr. Frenchman?

21   All right.  And if you could blow up the bottom two, the green

22   one and the one below it.

23   Q.  Now, this is of course a text between that same number,

24   5555, that is your son, Billy Ortega, and another number saved

25   in Mr. Ortega's phone as Little Bro Kev.  Obviously your own

1  son is named Keven, and he's Billy's younger brother; correct?

2  A.  No, Keven is my child.

3  Q.  Okay.  As is Billy.  They're brothers.

4  A.  Yes.

5  Q.  And in this top green message from Mr. Ortega, he says, in

6  part, people up there.  I don't want to hear Ma complaining

7  about the same thing over and over.

8          Did you hear that, Ms. Marine?

9  A.  No.

10  Q.  Well, are you able to see the exhibit, Ms. Marine?

11  A.  I said I can't see well.

12  Q.  All right.  I'm just going to read what I just read before.

13  In the middle of the green text message from Mr. Ortega to

14  Mr. Quezada says, in part, stop taking P-P-L, people, up there.

15  I don't want to hear Ma complaining about the same thing over

16  and over.  Bro, just get your own spot already.

17          And then, the response from Little Bro Kev is, n-word,

18  it ain't nothing like that.  Don't listen to your mother.

19  A.  Pardon for the interpreter.

20          What was the question part of it?

21          MR. HERMAN:  I don't have a question yet.

22          You can take down the exhibit.

23  Q.  Now, Ms. Marine, you previously testified about your cancer

24  diagnosis and the surgery and treatment that you had

25  afterwards.

1           Do you remember that testimony?

2    A.  Yes.

3    Q.  And you underwent a surgical procedure on July 23, 2019, in

4    the hospital?

5    A.  Yes.

6    Q.  And then you were discharged on day two from the hospital?

7    A.  No; three days.

8    Q.  Well, I think you testified on direct that it was four

9    days.  Was it two days, three days, or four days?

10   A.  (In English) Three or four days.

11           INTERPRETER:  The interpreter will restate what was

12   said in English.  Three or four days.  I think four.

13   A.  (In English) Four days.

14   Q.  And after you were discharged from the hospital, you went

15   home, the same apartment in the Fulton Houses we've been

16   discussing; correct?

17   A.  Yes.

18   Q.  And after that time, you had regular treatment by doctors

19   for your cancer; correct?

20   A.  Yes.

21   Q.  And that included a number of outpatient procedures;

22   correct?

23   A.  Yes.

24   Q.  Outpatient means you're not admitted to the hospital for a

25   procedure; you do it in the doctor's office and then you go

1    home the same day; correct?

2    A.  Yes, the second one.

3    Q.  Right.  Okay.  And you take a daily medication, a pill to

4    treat your cancer, even today; correct?

5    A.  Yes.  And I get a shot administered every six times for my

6    bones.

7    A.  (In English) Every six months.

8              THE INTERPRETER:  Interpreter correction.

9              Every six months.

10   Q.  The shot, is that related to your cancer, or no?

11   A.  No.  With osteoporosis.

12   Q.  I understand.  There were no surgeries around March of

13   2021; correct?

14   A.  No.

15   Q.  You testified on direct examination about when you were

16   arrested, law enforcement agents searched your apartment and

17   did not recover a safe in your hallway closet.

18              Do you remember that testimony?

19   A.  Yes.

20   Q.  And that arrest and search occurred in October of 2022;

21   correct?

22   A.  October 6, 2022.

23   Q.  And in other words, not on February 1, 2022; correct?

24   A.  And who said that?  No.

25              On October 1st is when they came to get me.

1    October 6.

2    Q.  Okay.  Now on March 17, 2021, did you give Rainey drugs

3    that day?

4    A.  No.

5    Q.  Rainey delivered drugs that day to three people who died.

6            Are you aware of that?

7    A.  No.  I found out later that people had died, that that's

8    why my son is in jail.

9    Q.  On March 17, 2021, and on March 18, 2021, you spoke with

10   your son numerous -- by son, I mean Billy Ortega.  You spoke

11   with Billy Ortega numerous times; correct?

12   A.  Well, I speak to my kids daily.

13   Q.  And when you spoke with Billy Ortega on March 17 and

14   March 18, you did so via WhatsApp; correct?

15   A.  I don't know.  I speak to them regularly over WhatsApp.

16           MR. HERMAN:  Mr. Frenchman, can you please publish

17   Government's Exhibit 101-13.

18   Q.  Now, this is a call log between your phone number, saved in

19   Ortega's phone as Fefe Marine, and that same 5555 number on

20   WhatsApp.

21           MR. HERMAN:  Now Mr. Frenchman, can you just publish

22   the first time stamp on line 1?  So that's March 18, 2021, at

23   3:13 and 49 seconds p.m.

24           And if you could go to the last line, Mr. Frenchman,

25   in the document -- or to the last page, page 6.  And can you

1    just pull up the time stamp; that's line 16.

2              And that's on March 17, 2021, at 12:57 p.m.

3    BY MR. HERMAN:

4    Q.  So Ms. Marine, do you see that between March 17, 2021, at

5    about 1 p.m. and the middle of the day on March 18, you had 16

6    WhatsApp completed or attempted calls with Billy Ortega?

7    A.  I didn't know.

8    Q.  Mr. Frenchman, can you go to line 9?

9              THE COURT:  Mr. Herman, how much longer do you have?

10             MR. HERMAN:  I only have about five minutes or less.

11             THE COURT:  Okay.

12   Q.  Do you see, Ms. Marine, on line 9 at 9:26 p.m. on March 17,

13   after these at least three people have died?

14             MR. RUSSO:  Objection, your Honor.

15             What's the point of interjecting that?

16             THE COURT:  Overruled.

17   Q.  You spoke with Billy Ortega for 51 seconds.

18             Do you see that, Ma. Marine?

19   A.  I speak to my children every day, all three of them.

20             MR. HERMAN:  Mr. Frenchman, can you go to line 7 now,

21   please?  And can you blow that one up?

22   Q.  So the following morning, March 18, 2021, at about

23   10:48 a.m., you spoke with Billy Ortega for 1 minute and 27

24   seconds.

25             Do you see that Ms. Marine?

1   A.  Yeah; I'm looking.

2            MR. HERMAN:  Nothing further, your Honor.

3            THE COURT:  Mr. Russo, do you have any follow-up?

4            MR. RUSSO:  I do, Judge.

5            THE COURT:  Okay.  How long will it take?

6            Do you want to come back?

7            MR. RUSSO:  Judge, I'll do whatever the Court wants.

8   Judge, I do want to address two general topics with Ms. Marine.

9   The first is, I want to resolve any confusion about her plea.

10           THE COURT:  Okay.

11           MR. RUSSO:  I can do that this afternoon.  I can do

12  that now.  I don't think I'll be much more than 20 minutes.

13           THE COURT:  Okay, then.  Why don't we take a break,

14  just because I do have something at noon.  I think my deputy

15  advised you of that in advance.

16           Why don't we meet again at 2:45, and I'll save you two

17  hours in the afternoon, and hopefully, that should be enough.

18  It sounds like it will be more than enough, but I appreciate

19  you saying you want to clarify that, because I was going to ask

20  you to speak to your client and address that.

21           Does the government have any objection with Mr. Russo

22  speaking with Ms. Marine, you know, while she just finished

23  cross examination?

24           MR. HERMAN:  No objection.

25           THE COURT:  So why don't you do that, and just get an

O4aFmarH                    Marine - Cross

1   assessment if she is seeking to withdraw her plea because I am

2   going to want to hear from you separately as to why her

3   allocution was sufficient.

4           I mean, if there's a need -- and I'm not saying there

5   is -- if there is a need to try this case again, I'd rather do

6   it now than after a 2255.  So I do want clarity, and I do want

7   to hear if she is seeking to withdraw her plea or not, and I'll

8   hear the government on that as well.

9           But I'll see you all at 2:45.

10          MR. RUSSO:  Thank you, Judge.  Fair enough.

11          (Luncheon Recess)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:45 p.m.

3              (In open court)

4              THE COURT:  You may proceed, Mr. Russo.

5              MR. RUSSO:  Thank you.

6    REDIRECT EXAMINATION

7    BY MR. RUSSO:

8    Q.  Hi, Josefina.

9    A.  Hello.

10   Q.  Earlier today, you were testifying regarding your plea,

11   your guilty plea.  And I wanted to clarify a couple of things

12   up for the record.

13             Was your plea to participating in a narcotics

14   conspiracy knowing and voluntary?

15   A.  Yes.

16   Q.  And did you know or should you have known that your

17   participation in this conspiracy involved narcotics?

18   A.  I should have known that, but I kind of foolishly tried to

19   ignore it, because he was my son.

20   Q.  And do you understand what you told the Judge, her Honor,

21   when you entered your plea about what your role in this

22   conspiracy was?

23   A.  Yes.

24   Q.  And what was that role?

25   A.  Storing the money, and I'm paying for it dearly now.

1  Q.  Now, is it your desire today to take back your plea or do

2  you wish to stand by your plea?

3  A.  I want to stand by my plea.

4  Q.  Thank you.

5       MR. RUSSO:  Your Honor, does the Court have any

6  further inquiry on that topic?

7       THE COURT:  When you said, I should have known that

8  the conspiracy involved narcotics, why should you have known

9  that?

10       THE WITNESS:  Because of the money that was coming,

11  arriving to me at the house.

12       THE COURT:  When you say because of the money, you

13  mean the quantity of the money?

14       THE WITNESS:  Well, the quantities weren't that big,

15  each package was maybe a thousand or 2,000.

16       THE COURT:  Did you have any suspicions that the money

17  came from drugs?

18       THE DEFENDANT:  At first, no; but later, yes.

19       THE COURT:  And when you say "later." do you mean

20  prior to the arrest of your son?

21       THE WITNESS:  When he was arrested.

22       THE COURT:  Right.  But before he was arrested, did

23  you have any suspicion that the money came from drugs?

24       THE DEFENDANT:  No, because he and the girlfriend had

25  a house they were renovating.

1          THE COURT:  And therefore, what?

2          THE WITNESS:  That they also were using money to do

3     the renovations.

4          THE COURT:  Look, I don't want to interrupt your --

5     the flow of your examination, Mr. Russo.

6          MR. RUSSO:  All right.

7          THE COURT:  So I'm happy to hear the parties out

8     later, if you prefer, on whether her allocution was knowing and

9     voluntary.  I mean, that's obviously a distinct analysis from

10    whether I can find, on the preponderance of the evidence, that

11    she was, in fact, involved in the conspiracy in certain ways.

12         MR. RUSSO:  I understand.

13         THE COURT:  But I will want to hear you out, and both

14    the parties out, on whether Rule 11 has been met.

15         MR. RUSSO:  I'll continue, Judge, just on the other

16    items of her cross-examination.

17         THE COURT:  Of course.  Please.

18    Q.  Ms. Marine, you were shown a text from William Drayton to

19    your son Billy in which Drayton asks your son Billy to send all

20    the information, tell your mom I'll be there in five minutes.

21    A.  Yes.

22    Q.  And were there ever times, that you recall, that Billy

23    would send someone to pick money up from you?

24         THE INTERPRETER:  Pardon for the interpreter.

25         MR. RUSSO:  That Billy would send someone to pick up

1   money from you.

2   A.  Yes.

3   Q.  And a moment ago when you were speaking with her Honor, you

4   mentioned something about packets of money, 2,000 or so

5   dollars.  Do you recall?

6   A.  Yes.

7   Q.  Who do you recall Billy asking to you give packets of money

8   to?

9   A.  Kaylen.

10  Q.  Anybody else?

11  A.  Sometimes William.

12  Q.  And this was the same money that -- well, withdrawn.

13          Why did you think, if you did, Billy was asking you to

14  give the money to Kaylen and William?

15  A.  Because they were paying for the home renovations.

16  Q.  Was it your understanding that they were going to bring the

17  money to Billy?

18  A.  Yes.

19  Q.  Now, you also had occasion this morning to see another

20  message that was from your son Keven to your son Billy in which

21  Keven was complaining to Billy about him taking people up,

22  presumably, to your apartment, and he didn't want to hear Ma

23  complaining over and over, bro, get your own spot already.

24          Do you remember that message in sum and substance?

25          Were there -- I'm sorry.

1    A.  Yes.

2    Q.  Do you recall a time that you complained or objected to

3    Billy bringing people into your house?

4    A.  Yes.

5    Q.  Explain to the Court why.

6    A.  It's because I would have arrived home tired from work

7    ready to go to sleep, and then he would came later with his

8    friends to talk and have a drink, and they would speak too

9    loudly.  And I couldn't sleep and I wanted to rest.  I was

10   tired from work.

11   Q.  Did this occur -- and by that, I mean Billy bringing people

12   to the house -- more than once?

13   A.  Like three times.

14   Q.  And what was annoying about Billy coming to the house with

15   people?

16   A.  Because they talked too loud, and they'd start laughing and

17   I couldn't sleep.  And I told them that he had his own house,

18   and he should go to his own house with his friends.

19   Q.  Now, Josefina, you were asked about phone calls between

20   your phone and your son Billy's phone on March 17, 2021, and

21   again on March 18, 2021.

22        Do you have any independent recollection of those

23   phone calls?

24   A.  Yes.

25   Q.  And did you have phone calls with your son Billy before

1    March 17, 2021?

2    A.   Yes.

3    Q.   How often?

4    A.   I speak to my kids daily.  Yes.

5         Well, now, since I have been locked up, I haven't been

6    able to call, but I speak with Melanie and Keven.  I would

7    speak with them every day.

8    Q.   And how about after March 17, 2021?

9         Did you have any phone calls with Billy?

10   A.   Yes.

11   Q.   How often?

12   A.   Every day.

13   Q.   Did you and Billy ever discuss drugs or the drug business

14   on any of your phone calls?

15   A.   No.

16   Q.   What are some of the things you discussed with Billy, as

17   best you can recall, around March of 2021?

18   A.   Sometimes we'd talk about money.  Sometimes we'd talk about

19   the family.

20   Q.   Thank you Ms. Marine.

21        MR. RUSSO:  I have nothing further.

22        I guess we'll take up the things at the end.

23        THE COURT:  Thank you.

24        Anything from the government, any additional recross?

25        MR. HERMAN:  One moment, your Honor.

1            THE COURT:  Sure.

2    RECROSS EXAMINATION

3    BY MR. HERMAN:

4    Q.  Now, Ms. Marine, your testimony is that you occasionally

5    received money from Mr. Rainey and Mr. Drayton, that you

6    accepted it; correct?

7    A.  That's right.

8    Q.  And you also testified that Billy instructed you to then

9    give money to Rainey and Drayton as well; correct?

10   A.  Yes.

11   Q.  To renovate Billy's home in New Jersey?

12   A.  They buy and do the renovations, and they would sell them.

13   Q.  Okay.  So your testimony is that Rainey and Drayton gave

14   you money that you then gave right back to them.

15           That's what you said you did?

16           MR. RUSSO:  Objection, your Honor.

17           Mischaracterizes the testimony.  She didn't say she

18   gave them right back.

19           THE COURT:  I'll let her answer yes or no.

20           THE DEFENDANT:  Yes.  They would take it to New

21   Jersey.

22   Q.  Okay.  So they gave you money and then you gave it right

23   back to those same people?

24   A.  Yes, like two or three weeks later.

25           THE COURT:  And why did you think you were doing that?

1    THE WITNESS:  I don't know.

2  BY MR. HERMAN:

3  Q.  And you never received money from anybody else?

4  A.  No.

5  Q.  Now, if I heard you correctly, you said you do have an

6  independent recollection of your WhatsApp phone calls with

7  Billy on March 17 and March 18; is that correct?

8  A.  Yes.  We spoke by WhatsApp and regularly.

9  Q.  What did you speak about on March 17 and 18, 2021?

10  A.  Well, I can't remember now.  It's going on three years.

11  Q.  But you do remember speaking approximately 16 times on

12  those two days?

13  A.  I speak with my children every day.

14    (Counsel conferred)

15    MR. HERMAN:  Nothing further, your Honor.

16    THE COURT:  Ms. Marine, when you pled guilty, I asked

17  you if you agreed with at least one other person to distribute

18  narcotics, and you said yes.

19    How did you agree to do that, and who did you agree

20  with to do that?

21    THE WITNESS:  What I received was the money.

22    THE COURT:  No.  I know, but I'm asking you if you

23  agreed with another person to distribute narcotics.

24    THE WITNESS:  No.

25    THE COURT:  Okay.  All right.

1    So folks, I want to say something, and then I want to

2    see if we have some additional questions for Ms. Marine.

3    So, Ms. Marine's allocution -- as I'm sure you all

4    remember, and we all, obviously, have a transcript -- was a bit

5    rocky at the start, but she ultimately said that she agreed

6    with another person to distribute narcotics.

7    The combination of what she said at that allocution,

8    she ultimately said the magic words.  And then today, however,

9    gives me pause about whether her allocution is sufficient.  And

10   I just want to make sure that we all feel comfortable that it

11   was, before we proceed to sentencing.

12   So at Ms. Marine's allocution, she admitted that

13   during some parts of 2018 until 2022, she participated in a

14   conspiracy to distribute narcotics here in Manhattan, but she

15   also said that she didn't know what she was doing, and she

16   didn't know and it's illegal to sell cocaine and fentanyl.

17   Ultimately, I asked Ms. Marine, did you agree with at

18   least one other person to distribute narcotics, and she

19   answered yes.  She answered yes to that question again today,

20   but then when I followed up, she said no.

21   Today, Ms. Marine testified that, although she was

22   storing money and received the money, that she didn't know what

23   it was from.  She stated that she didn't know but that she

24   should have known where the money came from.

25   Later in the testimony, she stated that she didn't

1    know the money came from the sale of narcotics until after

2    Mr. Ortega was arrested, but again stated that she should have

3    known.  But when I asked her why she should have known, she

4    said, because of the money.

5         But when I asked her if she had any suspicions that

6    the money was coming from the sale of drugs, she said no.  So

7    again, I just want to make sure, so that we don't end up having

8    a trial years from now, that Ms. Marine voluntarily and

9    knowingly pled guilty and admitted that she agreed with at

10    least one other person to distribute narcotics.

11         And to be clear, this is a distinct question from

12    whether the government has established by a preponderance of

13    the evidence her role in the conspiracy, which I believe it

14    has, consistent with what it said it would prove in its letter.

15         But in the first instance, I need to make sure that

16    her plea was volunteer and knowing, and even though she said

17    the mac I can word magic words, whenever I follow up, she's

18    saying something inconsistent with those magic words.

19         As explained by the Second Circuit, in order to

20    convict a defendant of the crime of conspiracy, the government

21    must show that two or more persons entered into a joint

22    enterprise for an unlawful purpose with an awareness of its

23    general nature and extent.  That's the *Torres* case, 604 F.3d,

24    65.  The government can establish an 846 conspiracy to

25    distribute or possess with intent to distribute without proving

*inter alia* that the defendant knew that the conspiracy involved

a controlled substance. *Id.* at 66.

The government need not prove that the defendant knew

the specific drug at issue, but only that he was dealing with

some controlled substance. That's the *Davis* case, 690 F.3d,

131. However, proof that the defendant engaged in suspicious

behavior without proof that he had knowledge that his conduct

involved narcotics is not enough to support his conviction for

conspiracy to traffic in narcotics. *Torres*, 66.

Proof that the defendant knew that some crime would be

committed is not enough. *Id.* at 69.

To the extent that the parties are arguing that her

plea of guilty is adequate, based on a conscious avoidance

theory, that doctrine can establish a defendant's knowledge of

the conspiracy's goal. Knowledge, in conspiracy cases,

consists of two elements: knowing participation or membership

in the scheme charged and some knowledge of the unlawful aims

and objectives of the scheme.

The conscious avoidance doctrine may establish the

latter element, but not the former. That's the *Jiminez* case,

586 F.App'x, 54. And conscious avoidance is seen when the

defendant was aware of a high probability of a fact in dispute

and consciously avoided confirming that fact. That's from the

*Ferrannini* case, 219 F.3d, 154.

However, the simple statement that someone should have

known does not meet this standard.  In *United States v. Abreau*,

for example, the Second Circuit noted, the common misconception

that the conscious avoidance theory allows the prosecution to

establish knowledge by proving only that the defendant should

have known of a certain fact, even if he did not actually know

it.  That's *Abreau* at 188.  And *Abreau* is 342 F.3d 183.

Although it's true that the state of mind necessary to

establish conscious avoidance is something less than complete

certainty it's not enough that the defendant should have known

the particular fact.  The conscious avoidance theory permits a

jury to impute knowledge only if a defendant disregarded a fact

despite his actual subjective awareness of the high probability

of its existence.

So that's the law.  I think the question is, what

should we do next?  Are there any additional questions that I

have not asked, or the parties have not asked, that they would

like to ask Ms. Marine?  Do you want to look back at the

transcript and brief this for me?

I mean, what would you propose in terms of next steps.

Again, I just want to make sure we're all on the same page, and

we feel that that was sufficient.

MR. RUSSO:  Judge, I think, and still think, that

Ms. Marine has knowingly and adequately allocuted.  In fact,

the Court, citing to the law that you did is directly out of

the pattern jury instructions that are given in this Court in a

o4aFmarH

1   narcotics conspiracy case.

2          And I verily believe, and I think it's clear, that if

3   Ms. Marine's testimony at trial, in her own defense, was

4   consistent with the testimony she's giving here today regarding

5   her allocution, a jury could easily find conscious -- she

6   consciously avoided, or knowingly or knew, should have known

7   that her son was involved in, was running a narcotics business,

8   and her collecting the money and her participating in that was

9   her participation in a conspiracy.

10         I honestly believe that Ms. Marine's hang up here,

11  Judge, has always been, when the question is posed to her:  Do

12  you admit that you participated in a narcotics conspiracy, she

13  translates that in her mind to:  Do you agree that you

14  negotiated narcotics, drugs.  And she cannot testify to that,

15  and she cannot admit to that, because that is not her truth.

16  That is not her truth.  She participated in a conspiracy, which

17  was a narcotics conspiracy, by accepting money.

18         And that is enough to convict her in this narcotics

19  conspiracy, and hence, Judge, it's enough to let her plea

20  stand.

21         THE COURT:  But what -- I mean, whenever I

22  continuously asked sort of what her suspicions were based on,

23  my understanding is, she said she didn't have any until after

24  the arrest, that she should have known, but she didn't know,

25  and she thought the money related to the house.

1          So what was she aware of a high probability of?

2          MR. RUSSO:  Again, Judge, when she said the house, I

3   think that was in reference to, what did she think Billy wanted

4   the money for; because he was renovating a house.

5          My recollection is -- and we can check this -- is that

6   today, earlier today, she said something, that she was a

7   mother, and she probably turned a blind eye, and she probably

8   knew on some level that she was dealing drugs, but she turned a

9   blind eye to it, as a mother.  That's what I kind of got out of

10  it.

11         THE COURT:  There was something short of that.

12         If she had said all of that, I would not have the

13  hesitation that I have.

14         MR. RUSSO:  We can give her that opportunity, Judge.

15  I went through this with her, Judge, during the break.  I told

16  her all her options.  I said, do you want to say that you

17  didn't know and you want your plea back, and she was emphatic.

18  She said no, and she said it again on the stand this afternoon.

19         THE COURT:  No one is pressuring her one way or the

20  other.

21         MR. RUSSO:  That's correct.

22         THE COURT:  But I need to make sure that it's knowing

23  and voluntary with respect to the crime that she admitted to.

24         I don't know if the government has any suggestions, if

25  there are any additional questions I should ask, if you want to

1    think this over.

2            MR. FERGENSEN:  May we have just one moment, your

3    Honor.

4            THE COURT:  Please.  Take your time, and I'll look

5    back in the transcript while we talk.

6            (Counsel conferred)

7            MR. FERGENSEN:  Thank you, your Honor.

8            THE COURT:  Yeah, sure.

9            MR. FERGENSEN:  So I think, a few points.  The first

10   is that, given the trial record, given the record, the factual

11   record today from the government's presentation, there is ample

12   evidence, in fact, I think, evidence that would even survive a

13   Rule 29 motion, that Ms. Marine is, in fact, guilty.

14           THE COURT:  I agree with you.

15           MR. FERGENSEN:  And so the second point is that, her

16   testimony today was false, and that may mean she is also guilty

17   of perjury, but it doesn't mean that we have a problem of, say,

18   actual innocence, and it doesn't necessarily mean -- at least

19   in the government's view; and this is, you know, initial

20   reaction, your Honor -- but it doesn't mean that there's a

21   problem with her sufficient allocution on a prior day when she

22   wasn't lying.

23           THE COURT:  I agree with all of that so far.  I agree

24   that there's a sufficient factual predicate for the guilty

25   plea, 100 percent.  The question is, is her plea, is it knowing

1    and voluntary?  And by that, I mean, does she understand when

2    she continues to say, yes, I participated in this conspiracy,

3    but then she denies, factually, anything that would support

4    that statement.  Is her admission knowing?

5             Does she really understand what she's pleading to?

6             MR. FERGENSEN:  So, I would this is an unusual

7    context, your Honor.

8             THE COURT:  Agreed.

9             MR. FERGENSEN:  But I think my inclination is that,

10   she's lying about her conduct today.  And so she is trying to

11   have it both ways, where she gets the benefit of a plea

12   agreement but completely minimizes her knowledge and

13   culpability, shortly before her sentencing.

14            THE COURT:  I agree with that too, but it doesn't

15   answer the original question about, was her plea really knowing

16   and voluntary?  Does she understand that just storing money,

17   without any knowledge whatsoever and without the conscious

18   avoidance standard being met, does she know that that does not

19   rise to the level of guilt?

20            MR. FERGENSEN:  Understood, your Honor.

21            And I can speak for the government.  We very much

22   appreciate your Honor's careful attention to this and the case

23   citations on the legal issues that it might raise.  I think our

24   proposal would be to not set forth our final position today,

25   but to have some conversations, including with the appeals

1  unit, and get back to the Court, in addition to, after also

2  conferring with Mr. Russo on when we might submit something in

3  writing to your Honor after giving it, you know, further and

4  appropriate consideration.

5       THE COURT:  I really appreciate that, and I think

6  that's exactly what we should do.

7       And Mr. Russo had asked, in any event, so adjourn

8  Monday's sentencing for scheduling reasons.  I know you had

9  talked to my deputy about moving to the afternoon.  I'm

10  available in the afternoon, but I think it's critical that we

11  address this issue in advance, so for now, I think we should

12  adjourn Monday's sentence, and we should --

13       MR. RUSSO:  And I'm sorry to interrupt, Judge, but

14  that's the issue of whether or not Ms. Marine's allocution

15  during her plea was sufficient to make out guilt under

16  (b)(1)(C).

17       THE COURT:  And whether her plea is knowing and

18  voluntary, because she, again, continues to say that she

19  engaged in this conspiracy, but then when she's asked any

20  questions about who she agreed with, what she agreed to do, and

21  what the basis of her knowledge was, what her intent was,

22  again, I just want to make sure that it's legally sufficient.

23       MR. RUSSO:  That's fine, Judge.

24       I probably am confusing my private conversations along

25  with her public testimony, because I think that she knows that

1    she participated in a conspiracy.

2            THE COURT:  If that's true, you're welcome to discuss

3    things with her further.  I'm happy to take a break now, but

4    while she's here, you know, and if there's anything else she

5    wants to say, she's free to say it.  There's no pressure

6    whatsoever on her to say anything additional, but feel free to

7    have a further discussion.

8            But that's where I think we are.

9            MR. RUSSO:  Yeah.  If it's just on that Judge -- I

10   don't know that I agree, or that I would suggest that the Court

11   should agree, that Ms. Marine lied today.

12           In fact, my position is that Rainey lied today, but

13   you know, I think the time for that is probably at the next

14   step; right?

15           THE COURT:  Okay. all right.

16           MR. RUSSO:  So I'm not going to respond to the

17   government's repeated allegations that my client was lying.

18           THE COURT:  Do you want to speak further with

19   Ms. Marine at this point in time?

20           MR. RUSSO:  Judge, maybe what I could do is -- so we

21   can move this quickly on, is, speak with -- maybe we could

22   speak with the Court and counsel in chambers so that we're all

23   on the same page as to exactly what we're looking for, and then

24   I can speak with Ms. Marine.

25           THE COURT:  I'm not sure what that means.  Court

1    proceedings are open proceedings, so I'm not going to have a

2    proceeding either without her or without the public present, so

3    I'm not sure what that means, in my chambers.

4         MR. RUSSO:  Just as we were going to adjourn so I can

5    speak with the government as to --

6         THE COURT:  Sure.

7         I'm happy to adjourn.  You're free to speak with the

8    government.  You're, of course, free to speak with your client;

9    I think you should, and then I'll look forward to getting an

10   updated letter on next steps.

11        I will say there was also a legal issue that I just

12   wanted you to address prior to sentencing, and that was with

13   regard to the death resulting guideline.  Although the Second

14   Circuit has yet to address the issue, there is out-of-circuit

15   case law, which holds that section 2D1.1(a)(2) may be

16   inapplicable to a defendant where the resulting death was not

17   admitted to by the defendant or proven beyond a reasonable

18   doubt.

19        So for example, in *United States v. Lawler*, the

20   Seventh Circuit held that, for the offense of conviction to

21   establish the death resulted from the use of the substance, the

22   death must be an element of the crime that is admitted by the

23   defendant or proven beyond a reasonable doubt.

24        And the Sixth Circuit had a similar holding in *United*

25   *States V Redmond*, 321 F.3d 540, 542.

o4aFmarH

1          *Lawler* is 818 F.3d 281 and 284.

2          So I wanted to hear the parties out, as well, about

3     that.  Obviously, it's not in-Circuit case law, but I did want

4     to hear your arguments as to the applicability of that law in

5     advance of sentencing.

6          So why don't we, unless I hear otherwise, we can

7     adjourn for the day.  And then just write me an update after

8     you consult with folks in your office and/or each other, and

9     propose next steps to me.

10          MR. FERGENSEN:  Thank you, your Honor.

11          THE COURT:  Thank you.

12          MR. RUSSO:  Sorry, Judge.  Adjourned for when?

13          Because I don't want to be late.

14          THE COURT:  We don't have a date of adjournment.  I'm

15     happy to schedule something today if you want to, but it seems

16     like we need to figure out what the next steps are first.  So

17     I'm more than happy to put something on the calendar,

18     including, if you wanted to talk about this further, on Monday.

19     But I do think we need to address a few things before the

20     sentencing can proceed.

21          MR. RUSSO:  I agree.  So we can leave it at an open

22     date and contact the Court.

23          What I'll do is, I'll speak with the government.

24          My understanding of our marching orders, so to speak,

25     are -- one is, wrapping our hands around the allocution and

o4aFmarH

1    seeing if we can resurrect it, so to speak.

2              THE COURT:  If it was legally sufficient.

3              MR. RUSSO:  Keep it legally sufficient.

4              And two, there's a discussion as to whether or not we

5    need to add anything else to an allocution that's already been

6    had, in the plea agreement that's already been had.

7              THE COURT:  That if she's willing to admit it, or

8    whether that's even applicable, in light of her failure to

9    allocute to it.

10             All right?  Okay.

11             Thank you, folks.

12             We are adjourned.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination  of:                        Page

3    KAYLEN RAINEY

4    Direct By Mr. Fergensen  . . . . . . . . . . . 4

5    Cross By Mr. Russo . . . . . . . . . . . . . .17

6    JOSEFINA MARINE

7    Direct By Mr. Russo  . . . . . . . . . . . . .46

8    Cross By Mr. Herman  . . . . . . . . . . . . .57

9    Redirect By Mr. Russo  . . . . . . . . . . . .82

10   Recross By Mr. Herman  . . . . . . . . . . . .88

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25