

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, NY 10278*

February 20, 2025

BY ECF
Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Josefina Marine*, S3 22 Cr. 91 (RA)

Dear Judge Abrams:

      The Government respectfully submits this letter in response to defendant Josefina Marine's supplemental sentencing submission. (Dkt. 265). In the Government's initial sentencing submission, which is incorporated by reference here, the Government agreed with the recommendation of the U.S. Probation Office that a sentence of 180 months' imprisonment was appropriate. (*See* Dkt. 208). In light of Marine's perjury at the April 10, 2024 *Fatico* hearing which, as described below, warrants an obstruction-of-justice Guidelines enhancement, the Government respectfully submits that a sentence of between 180 months and the statutory maximum sentence of 240 months is the appropriate sentence.

## I.  The Obstruction of Justice Guidelines Enhancement Properly Applies

      Consistent with the Probation Office's position in the revised Presentence Report, the Court should impose a two-point obstruction enhancement, pursuant to U.S.S.G. § 3C1.1, to account for Marine's repeated perjurious testimony under oath at the *Fatico* hearing in an effort to secure leniency at sentencing.[1]  (PSR ¶ 80).

### A.  Relevant Facts

      At Marine's October 30, 2023 guilty plea proceeding, Marine admitted that she "agree[ed] with at least one other person to distribute narcotics." (Plea Tr. (Dkt. 189) 26; *see also id.* at 23 (Marine allocuting, "During some parts of 2018 until 2022, I participated in a conspiracy to distribute narcotics here in Manhattan")). However, prior to the original sentencing date in March

---

[1] In the plea agreement, the Government reserved the right to seek an enhancement for obstruction of justice if the defendant committed another crime, such as perjury, after pleading guilty. Plea Agreement at 4-5. Marine has not disputed the Government's right to seek this enhancement under the plea agreement.

2024, the Court ordered a *Fatico* hearing in light of Marine's claim in her original sentencing submission that she "never handed out drugs to anyone" which was contrary to the Government's position and the evidence at the trial of Marine's son, co-defendant Billy Ortega. (Dkt. 209 at 1; *see* Dkts. 205, 208). At the April 2024 *Fatico* hearing, Marine testified that all she did was accept and store money from co-defendants Kaylen Rainey and William Drayton on a few occasions and did not know that the money was narcotics proceeds until after Ortega was arrested. (*E.g. Fatico* Tr. (Dkt. 223) 89-90). Marine stated that she thought, instead, that it was for Ortega's "home renovations." (*Id.* at 85). Marine also repeatedly testified that she "never touched a bag of drugs at [her] apartment" and never handed drugs to anyone. (*Id.* at 71). When asked by the Court if Marine "agreed with another person to distribute narcotics" Marine said "No." (*Id.* at 89).

In light of these statements, the Court appointed new counsel to advise Marine as to whether she wished to attempt to withdraw her guilty plea. (Dkt. 231).[2] After consultation with new counsel, who was thereafter appointed for all purposes, Marine decided to re-affirm the existing plea agreement, as to which the Government remained bound. (Dkt. 245). The Court then ordered a plea re-allocution. (Dkt. 246). At that Court proceeding on December 13, 2024, Marine admitted, contrary to her position in her original sentencing submission and her sworn testimony at the *Fatico* hearing, that as part of her participation in the charged narcotics conspiracy, she would "hand-deliver" drugs to "another person" on behalf of her son Ortega and that she in fact knew at that time that what she was handing over was drugs. (Dec. 13, 2024 Tr. (Dkt. 254) 10). The Court asked Marine: "At the time that you participated in this conspiracy to distribute narcotics and you handed narcotics to another person for your son, did you know that you were handing narcotics over to that person?" Marine responded "Yes." (*Id.* at 11).

## B. The Court Should Apply the Obstruction of Justice Enhancement for Marine's Admittedly False Testimony at the *Fatico* Hearing

Under the Guidelines, false testimony is an appropriate basis for imposing an obstruction-of-justice enhancement. *See* U.S.S.G. § 3C1.1, Application Note 1(c); *see also United States v. Matos*, 907 F.2d 274, 275-76 (2d Cir. 1990) (upholding imposition of two-level upward adjustment where defendant testified falsely); *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015) (holding that obstruction under this provision includes perjury committed during a hearing.).

Because "[t]here is no protected right to commit perjury," *United States v. Grayson*, 438 U.S. 41, 54 (1978), penalizing a defendant at the sentencing stage for false statements made under oath does not violate the defendant's right to testify on her own behalf. *See id.* Rather, an enhancement for obstruction of justice is wholly warranted when the evidence clearly contradicts the defendant's factual testimony. *See, e.g.*, *United States v. Stewart*, 686 F.3d 156, 174-78 (2d Cir. 2012) (affirming enhancement where "[t]he jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly"). Where, as here, a defendant perjures herself and attempts to obstruct proceedings, "[i]t is rational

---

[2] At the *Fatico* hearing, Marine did not seek to withdraw her guilty plea—indeed, she specifically testified that "I want to stand by my plea." (*Fatico* Tr. at 83; *see also id.* at 82 ("Q: . . . Was your plea to participating in a narcotics conspiracy knowing and voluntary? A: Yes").

for a sentencing authority to conclude that a defendant . . . [is] attempt[ing] to avoid responsibility" and therefore is "more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process." *United States v. Dunnigan*, 507 U.S. 87, 97 (1993). That is because "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury." *See id.* at 98.

Indeed, in multiple recent cases in this district, district judges have applied the obstruction of justice enhancement where a defendant's false testimony was flatly contradicted by other evidence in the case, including, as here, trial testimony, electronic evidence, and the defendant's own later admissions. *See, e.g.*, *United States v. Torres*, S1 20 Cr. 608 (DLC), Dkt. 122 at 22-24 (Oct. 15, 2021) (applying obstruction-of-justice enhancement at sentencing where, through false testimony, there was "an intentional attempt [by the defendant] to obstruct justice and mislead the jury"); *United States v. Bimbow,* 21 Cr. 48 (JPO), Dkt. 116, at 4-5 (Dec. 21, 2023) (applying obstruction-of-justice enhancement after finding that the defendant "testified falsely" at trial).

The Second Circuit recently explained that to find a defendant committed perjury warranting an obstruction-of-justice enhancement:

> [T]he district court must in turn find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter. "Willfully," in this context, means with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory, and "material" refers to any evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination.

*United States v. Orelien*, 119 F.4th 217, 228 (2d Cir. 2024) (internal citations omitted); *see also* 18 U.S.C. § 1621 (perjury).

Here, as described above, and as she has admitted, Marine gave false testimony at the *Fatico* hearing by claiming that she never handed drugs to anyone and all she did was accept and store money from the co-defendants but did not know that the money was narcotics proceeds at the time. Marine now admits that this testimony was false—as she must, since it was overwhelming contradicted by the trial testimony and voluminous contemporaneous text messages, which the Government documented in its original sentencing submission. (*See* Dkt. 208 at 2-5 and App. A; *see also* Dkt. 265 at 20 (Marine acknowledging that her sworn testimony at the *Fatico* hearing "minimized her involvement in the offense)). But she urges the Court not to apply the obstruction-of-justice enhancement, claiming she only testified falsely because of poor legal advice from her prior attorney and her lack of understanding of the relevant legal concepts. (Dkt. 265 at 21-22).

But even if Marine's former attorney's legal advice was as Marine now claims, that would not excuse Marine's false testimony for several reasons. *First*, prior to Marine testifying, the Court specifically instructed Marine as to her Fifth Amendment right not to testify, including that doing

so "could affect [her] sentence," agreeing with the Government that her testimony could lead to "a sentencing guideline enhancement" (i.e., for obstruction). (*Fatico* Tr. at 43-45). In addition, the Court gave Marine time to confer again with her attorney prior to testifying and then specifically allocuted her on whether she was satisfied with her attorney's performance. (*Id.* at 45-46).

And while Marine now claims that her ████████████ along with "her lack of preparation, her inability to review the evidence against her, and her lack of understanding of the legal contours of the offense to which she entered a guilty plea" made her testify falsely (Dkt. 265 at 22), the *Fatico* hearing record belies that argument. At the *Fatico* hearing, Marine's lies were made without hesitating or equivocation. Rather, she provided *repeated* and *emphatic* false statements to the Court. For example, while Marine typically used a Spanish interpreter, she emphatically falsely stated, in English, "nobody" when asked if anyone referred to her as "Ma," the name the co-conspirators used to refer to Marine when asking Ortega to tell Marine to leave drugs out for them. (*Fatico* Tr. at 46). And during her direct testimony, when asked if she had a hallway safe, as the evidence showed she used to store the conspiracy's drugs, Marine lied "I've never had a safe," prompting defense counsel to make sure she was "certain, as you testify here under oath" about that, to which Marine again doubled down on her lie. (*Id.* at 49). And she repeatedly, unequivocally, lied multiple times about drugs, claiming again and again, including in response to the Court's clear questions, that she had never seen or touched drugs in her house. (*Id.* at 55; *see also id.* at 71-72 ("Q. Now, Ms. Marine, is it your testimony that you never touched a bag of drugs at your apartment? Is that your testimony? A. Yes.")). In short, Marine did not give halting or confusing testimony as one might if Marine did not understand the proceedings or failed to appreciate the legal contours of the offense. Rather, she gave clear, unequivocal lies over and over again, in an obvious attempt to minimize her conduct and seek leniency at sentencing. And the record suggests she did so, not because she didn't understand what was going on, but because she didn't want to admit to her daughter, who was in the audience at the *Fatico* hearing, what she had done. (*Id.* at 69-71).[3] Under these circumstances, the Court should apply the obstruction-of-justice enhancement. *See United States v. Lewis*, 62 F.4th 733, 747 (2d Cir. 2023) ("If a defendant testifies to a detailed account that is demonstrably false, the enhancement has been found to apply").

To be sure, the Government does credit as least some of the mitigating circumstances raised in the defense submission, and recognizes that Marine has now admitted what she has done, and therefore does not also seek to withdraw acceptance-of-responsibility guidelines levels, as is normally the case when an obstruction enhancement is applied. *See* USSG §3C1.1, Application Note (4) (noting that while "Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for h[er] criminal conduct[,] [t]here may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply").

---

[3] Throughout these proceedings, Marine's daughter has repeatedly asserted Marine's innocence. At the *Fatico* hearing, when the Government pointed out that Marine was testifying falsely, Marine's daughter yelled out from the audience: "She's not lying. She's not lying." (*Fatico* Tr. 68). And Marine's daughter is quoted in the Presentence Report as being "adamant that her mother committed no wrongdoing." (PSR ¶ 99).

## II.  The Death Resulting Guideline Properly Applies

As the Government explained in its April 16, 2024 letter (*see* Dkt. 220 at 3-4), the parties in their signed plea agreement specifically agreed, pursuant to U.S.S.G. § 1B1.2(a) and (c), that the "death resulting" Guideline applies "if the Court finds that the conspiracy charged in Count One distributed controlled substance(s) that caused the death of Julia Ghahramani, Amanda Scher, or Ross Mtangi."  Plea Agreement ¶ 3(c).  Under these circumstances, should the Court make the requisite factual finding, as the Government contends it clearly proved at the *Fatico* hearing (which incorporated the Ortega trial evidence), then the Court, pursuant to U.S.S.G. § 1B1.2(a) and (c), may find that the offense of conviction established that death resulted from the offense and that the "death resulting" Guideline applies.  *See, e.g.*, *United States v. Nedelcu*, 46 F.4th 446, 451 (6th Cir. 2022) (where defendant stipulated to facts establishing the commission of money laundering, § 1B1.2(c) "required that, during sentencing, he be 'treated as if [he] had been convicted of additional count(s) charging' violations of § 1956").

Indeed, the 2024 amendments to U.S.S.G. § 2D1.1(a)(2) (the death resulting Guideline), relied on by Marine, supports the Government's view.  Those amendments clearly state that where "the parties have stipulated to . . . such base offense level," then the Guideline should apply.  *See* Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index at 23.  Here, the plea agreement clearly states: "The parties agree not to appeal, collaterally attack, or otherwise challenge the Court's determination of the base offense level for Count One, including the Court's determination of whether death or serious bodily injury resulted from the use of the substance."  Plea Agreement ¶ 3.  The parties further stipulated and agreed that:

> [P]ursuant to U.S.S.G. § 1B1.2(a) and (c), that if the Court finds that the conspiracy charged in Count One distributed controlled substance(s) that caused the death of Julia Ghahramani, Amanda Scher, or Ross Mtangi, then the offense of conviction establishes that death resulted from use of the controlled substances, and pursuant to U.S.S.G. §§ 2D1.1(a)(2) and 1B1.2, the base offense level is 38. If the Court does not make this finding, then, pursuant to U.S.S.G. §§ 2D1.1 (a)(5) and (c)(5), the base offense level is 30.

Plea Agreement ¶ 3(c).  Under this conditional stipulation, if the Court makes the *factual finding* as to Marine's involvement in the deaths of the three victims, then the parties have legally stipulated that the death resulting Guideline applies.  Accordingly, Marine's claim now that she has not stipulated to the applicability of this Guideline is an incorrect misreading of the plea agreement and should be rejected.[4]

---

[4] In the alternative, if the Court were to rule that the parties' plea agreement is unlawful, as Marine hints, then the Government should be free to withdraw from the plea agreement at its election and reinstate the existing charges.  The Government provided Marine with substantial consideration— agreeing to dismiss counts carrying a 15-year mandatory minimum—in substantial consideration

This approach—whereby the parties agreed that a particular Guideline would apply if the Court made certain factual findings, including the death resulting Guideline—has long used by the Government and defendants in many cases.  Indeed, it was recently adopted by Judge Carter in *United States v. Tejada Aybar*, 21 Cr. 599 (ALC), during which Judge Carter found that the death resulting Guideline applied where the Government proved the factual predicate and the parties agreed in the plea agreement, pursuant to U.S.S.G. § 1B1.2(a) and (c), that if the Court found the appropriate factual predicate, then the death resulting Guideline would apply.  (*See* Dkt. 220 Ex. B (*Tejada Aybar* Transcript) 17-18).[5]

Here, Rainey testified at Ortega's trial that he received the drugs from Marine at her apartment, where the drugs, drug money, and firearms were stored, including when he delivered the fatal drugs to the three victims.  On March 17, 2021, text messages showed that Ortega asked Rainey if he needed cocaine to deliver to the victims ("You need will[?]").  (GX 111-10 at 24).[6] Rainey did not respond by text and then Ortega sent Rainey the addresses of the victims.  (*Id.* at 25).  At trial, Rainey explained as follows:

> Q.    Now, to the best of your recollection, do you know why there was not a reply there?
>
> A.    I had received the drugs. So there was no reason to respond back.
>
> Defense Counsel: I'm sorry. I couldn't hear the answer.
>
> Rainey:    I had received the drugs from Josefina [Marine].  So there was no reason to reply back.

(Trial Tr. 661).

And at the *Fatico* hearing, Rainey clarified, consistent with his trial testimony, that while he didn't remember March 17, 2021, specifically, Marine typically was the person who gave him drugs when he was working for Ortega's drug business.  Given this testimony and the other evidence, the Court can find by a preponderance of the evidence that Marine provided Rainey the drugs that he gave to the three victims, resulting in their deaths.

In urging otherwise, Marine points to the fact that on certain occasions, Rainey received drugs from other members of the conspiracy, including other runners, or Ortega himself.  (Dkt. 265 at 21-22).  But none of those isolated examples were near in time to the fatal deliveries on March 17, 2021, and they were isolated occurrences, not the conspiracies' typical practice of

---

for the applicability of the death-resulting Guideline, should the Court find the requisite factual predicate satisfied.

[5] *See also United States v. Raul Silva*, 20 Cr. 120 (PKC) (similar plea agreement in which Judge Castel found that the death resulting guidelines applied after a *Fatico* hearing).

[6] "Will" was the term Ortega used to refer to cocaine.  (Trial Tr. 558).

Marine providing the drugs to runners like Rainey. Rather, the evidence adduced at Ortega's trial and at Marine's *Fatico* hearing is sufficient for the Government to meet the preponderance standard.

Accordingly, the Court should find, consistent with the evidence, the parties' plea agreement, and the Probation Office's position in the Presentence Report, that the death resulting Guideline applies to Marine's conduct.

## III. The Court Should Sentence Marine to Between 180 and 240 Months' Imprisonment

In its initial sentencing submission, the Government detailed the reasons why a significant sentence consistent with the Probation Office's recommendation of 180 months' imprisonment was appropriate. (*See* Dkt. 208 at 9-14).[7] But the Court might consider that a higher sentence is appropriate in light of Marine's perjurious testimony and to send the appropriate message that committing perjury before the Court requires extra punishment. Otherwise, criminal defendants would be free to lie under oath in court with impunity, knowing that if they get caught (and many won't), it will not be any additional punishment.

The Court should reject Marine's arguments for a sentence "substantially less than that of" co-defendant William Drayton, whom the Court sentenced to a within-Guidelines sentence of 78 months' imprisonment. (Dkt. 151). *First*, Drayton was substantially differently situated from Marine. He was a runner for Ortega, delivering drugs to customers (which he obtained from Marine) and collecting drug proceeds (which he provided to Marine). He also occupied a mid-level supervisory role in that he at times directed other runners like Rainey and held larger amounts of money for Ortega. But unlike Marine, who allowed Ortega to co-opt her public housing project apartment to be the base of operations for the drug business, Drayton was not an indispensable conspirator that the conspiracy needed to operate. Indeed, despite having an apparently legitimate job (PSR ¶ 105), Marine nevertheless turned her NYCHA apartment into a full-blown stash house, protected by firearms, which allowed Ortega's drug delivery service to operate—at significant financial benefit to Ortega, all the while lying to NYCHA authorities about the occupants of her apartment. (*Fatico* Tr. 59 (Marine admitting she lied to NYCHA authorities)). *Second*, Drayton exhibited early acceptance of responsibility: after having only been charged with a (b)(1)(C) offense by complaint, he agreed to waive indictment and plead guilty to a superseding information that charged him with a mandatory minimum sentence and acknowledged that he was, at times, a supervisor in Ortega's drug delivery service. Marine, meanwhile, repeatedly minimized her role

---

[7] The Government is also mindful that Marine would likely be eligible for a number of credits against her sentence in prison. As an illustrative example, the Court might have anticipated that Ortega would be in prison until he is "almost 70" (Dkt. 177 at 68) in light of the Court's imposition of the 30-year sentence, but in fact Ortega is set to be released in 2047, when he will be 60 years old, after serving only 25 years, at least some of which could be at a residential reentry center or home confinement. Marine would likely be eligible for additional credits up to 12 months against her sentence for which Ortega was ineligible because of his leadership in the conspiracy. *See* 18 U.S.C. § 3624(g)(3). Other programming, such as the Residential Drug Abuse Program ("RDAP"), could further reduce her sentence. *See* 18 U.S.C. § 3621(e)(2)(B).

in the conspiracy, including repeatedly lying under oath at the *Fatico* hearing. *Third*, Marine's sentencing Guidelines range is substantially higher, accounting for her longer-time role in the conspiracy (and thereby a greater attributable drug weight) and her role in the three victims' deaths. As a result, the Probation Office has recommended a substantially higher sentence for Marine than it did for Drayton. The Government agrees. The Court should, therefore, sentence Marine to a higher sentence than it did for Drayton.

The Court should also reject Marine's arguments that she was equally or less culpable than others who were not charged, like Drayton's mother. As the evidence made clear, Drayton's mother was only involved for a very short period of time after the deaths (after Ortega moved the drug stash temporarily to her apartment, presumably to avoid detection after the three victims died), did not have firearms in her apartment, and did not have her apartment used to break down and package substantial quantities of drugs. (*See* GX 111-77 at 13-18).[8] Indeed, by May 2021— two months after the victims' deaths—Ortega had already moved the drugs back to Marine's apartment, and Rainey resumed giving the drug money to Marine and receiving the drugs from her. (*See e.g.*, GX 111-81 at 2 (On May 18, 2021, Rainey telling Ortega that he gave drug money to Marine "the other night"); GX 111-82 at 19 (On May 23, 2021, Rainey telling Ortega to "[t]ell Ma [Marine] [t]o leave it [i.e. drugs] out")).[9]

Finally, the Court should reject Marine's argument for an extraordinarily large variance on account of ███████████████ and the conditions at the Metropolitan Detention Center ("MDC"). While the Court can and should take these circumstances into account in fashioning an appropriate sentence, MDC conditions cannot justify a significant variance from the applicable Guidelines sentence. And while a number of courts in this District have previously found that the conditions at MDC were in need of significant improvement, the MDC has over recent months taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels (including substantially increasing medical staff), and addressing persistent medical issues. As Judge Caproni noted two months ago, "MDC is improving every day." (24 MJ 4261 (UA) (VEC), Dec. 10, 2024 Tr. at 15.). Even more recently, Judge Caproni (who is intimately involved in MDC issues) stated:

> Let me just say, [the stories of horrible MDC conditions], that's just not true anymore. All of those [court] decisions that you read about were months ago. There's a lot more staffing at the MDC. The number of defendants who are ending up in lock down for substantial periods of time are minimal. . . . I can only say,

---

[8] Indeed, on March 29, 2021, Rainey had to ask Ortega which apartment Drayton's mother was in, presumably because he did not regularly go there. Ortega responded "I for got which one .. but I know it's the 21 floor." (GX 111-77 at 17-18).

[9] To the extent that Marine asserts that the Government should have charged Drayton's mother, the Government respectfully directs the Court to Judge Garnett's recent statement: "It is an unfortunate reality of law enforcement activity and criminal prosecution that only a relatively small percentage of offenders are charged with the crimes they commit." *United States v. Ephron,* 2025 WL 524027, at *4 (S.D.N.Y. Feb. 18, 2025).

> MDC—look, it's a jail. But the horror stories from a year ago are just—it's not the [same] facility [as it was then]. They have put a lot more staff on. They've got a lot more medical staff, and they're doing the best they can.

*United States v. Alexander et. al*, 24 Cr. 676 (VEC), Jan. 16, 2025 Tr. at 125.

Moreover, while Marine complains about frequent "lockdowns," among other issues (but has not submitted an affidavit or any admissible evidence to support that assertion), she was not incarcerated at the MDC in 2020, 2021, or 2022, at the height of the COVID-19 pandemic where there were more frequent lockdowns. And even when defendants were incarcerated at the height of the pandemic, courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).



None of Marine's arguments either collectively or individually warrant the substantial variance that she is seeking. Instead, the Court should sentence Marine to a sentence of between 180 and 240 months' imprisonment.

## IV.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence between 180 and 240 months' imprisonment.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

by: _Michael R Herman_____

Micah F. Fergenson / Michael R. Herman
Assistant United States Attorneys
(212) 637-2190 / -2221

Cc:  Defense Counsel (By ECF)