UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 Cr. 091 (RA)

JOSEFINA MARINE,

Sentence

Defendant.

------------------------------x

New York, N.Y.
February 27, 2025
2:13 p.m.

Before:

HON. RONNIE ABRAMS,

District Judge

APPEARANCES

MATTHEW PODLOSKY
United States Attorney for the
Southern District of New York
BY: MICHAEL HERMAN
Assistant United States Attorney

GELBER & SANTILLO PLLC
Attorneys for Defendant
BY: KRISTEN MARIE SANTILLO

Also Present:

Gabriel Mitre, Interpreter (Spanish)
Elle Dowd, Interpreter (Spanish)

(Case called)

MR. HERMAN: Good afternoon, your Honor. Michael Herman for the government.

THE COURT: Good afternoon.

MS. SANTILLO: Good afternoon, your Honor. Kristen Santillo on behalf of Ms. Marine who is standing to my left.

THE COURT: Good afternoon to both of you. You can all be seated. Thank you.

So I'll note for the record that Ms. Marine is being assisted by a Spanish interpreter. If at any time you are having trouble understanding what I'm saying in this proceeding, either because of the language barrier or for some other reason, please let me know.

Okay, Ms. Marine?

THE DEFENDANT: Yes.

THE COURT: Okay. So this matter is on for sentencing. Ms. Marine, we allocuted her guilty plea in December to the lesser included offense of Count One of conspiring to distribute and possess with the intent to distribute narcotics in violation of 21, United States Code, Section 841(b)(1)(C) and 846.

In connection with today's proceeding I reviewed the following submissions: The amended revised presentence investigation report dated January 21st of this year; Ms. Marine's sentencing memorandum dated February 7, with

various accompanying exhibits, along with the supplemental admission on February 26th; the government's sentencing memorandum dated March 5th, 2024, and its supplemental submission dated February 20th; and various victim impact statements from family members and friends of Julia Ghahramani, Amanda Scher, and Ross Mtangi.

Are there any other submissions that I'm missing, and have the parties received each of these submissions?

MR. HERMAN: No, and yes, your Honor.

THE COURT: Okay.

MS. SANTILLO: No. As far as --

THE COURT: You have everything? You've seen everything?

MS. SANTILLO: You have all our submissions.

THE COURT: And there's nothing else I'm missing?

MS. SANTILLO: Yes.

THE COURT: So why don't we begin by discussing the presentence report, which, as you all know, is prepared by the United States Probation Department.

Ms. Santillo, have you read the presentence report and discussed it with your client?

MS. SANTILLO: Yes, I have, your Honor. And I had it interpreted or translated for Ms. Marine in Spanish.

THE COURT: Thank you. And do you have any objections?

MS. SANTILLO: Yes, your Honor. We noted our objections to the presentence report in our submissions, including the guideline calculation.

THE COURT: Yeah. So let me clarify. Put aside the guidelines calculation and the recommendation, do you have any other objections?

MS. SANTILLO: Aside from that, we do not.

THE COURT: Thank you.

Ms. Marine, did you have enough time and opportunity to go over the presentence report with your attorney?

THE DEFENDANT: Yes.

THE COURT: And was the presentence report translated for you?

THE DEFENDANT: Yes.

THE COURT: Okay. And so you read it with the assistance of an interpreter; is that correct?

THE DEFENDANT: Yes.

THE COURT: Does the government have any objections to the presentence report?

MR. HERMAN: No, your Honor.

THE COURT: Okay. The Court adopts the factual findings in the report. The presentence report will be made a part of the record in this matter and placed under seal. If an appeal is taken, counsel on appeal may have access to the sealed report without further application to the Court.

So, Ms. Marine, when you pled guilty we discussed the federal sentencing guidelines, the guidelines contained in a book like this manual here. They're a set of rules. They're published by the United States Sentencing Commission, and they're designed to guide judges when they impose sentence. At one time they were mandatory, meaning judges were required to follow the guidelines. They're no longer mandatory, but judges must nonetheless calculate the guidelines and consider them when determining an appropriate sentence.

So the parties appear to dispute two guidelines issues. The two-point obstruction of justice enhancement under 3C1.1 and the base offense level provision in 2D1.1(a)(2). I've obviously read your letters, but if you want to be heard further, I'll give you the opportunity to do so now.

Ms. Santillo, would you like to be heard further on either of those guidelines issues?

MS. SANTILLO: Your Honor, if you could, my sincere apologies. I was just ensuring that Ms. Marine's microphone was working. I think it was low.

THE COURT: Okay. Her headset or the microphone?

MS. SANTILLO: Her headset was not working.

THE COURT: Okay. So now it's working?

MS. SANTILLO: Yes, your Honor.

THE DEFENDANT: (In English) Yeah, she fix it.

THE COURT: Did she miss anything? Do you want me to

say anything again?

MS. SANTILLO: If you could go back to the last portion.

THE COURT: So I was talking about the sentencing guidelines that are a set of rules published by the Sentencing Commission designed to guide judges when they impose sentence. At one time, they were mandatory, meaning judges were required to follow them. They are no longer mandatory but judges must nonetheless properly calculate the guidelines and then consider them.

And here, in this case, it seems like the parties, your lawyer and the government disagree or dispute two guidelines provisions that I want to talk about briefly now. The two-point obstruction of justice enhancement under 3C1.1, and the base offense level provision in 2D1.1(a)(2).

So, again, I read your letters very carefully. But if either counsel would like to be heard further on these issues, I'm happy to give you the opportunity to do so now.

MS. SANTILLO: Your Honor, as you're aware, we submitted very detailed papers, which I think establish the legal arguments and the factual basis why we think that those guidelines don't apply, and I'm happy to address any specific questions about those.

THE COURT: I don't have any.

Does the government want to be heard further?

MR. HERMAN: Likewise, your Honor, we can rest on our submission.

THE COURT: Okay. Thank you. So I am ready to rule on those.

First, with respect to the obstruction of justice enhancement, I find that the two-point enhancement does apply. Under Section 3C1.1, a defendant can be subject to this enhancement when she willfully and materially committed perjury, which is the intentional giving of false testimony as to material matter. That's a quote from the *Orelien* case, 119 F.4th at 224.

Here, Ms. Marine repeatedly made false statements at the Fatico hearing that she now admits were false. Most significantly, she claimed time and time again that she had never seen or touched drugs in the house. At one point the Court even stepped in and asked her point-blank if she had ever seen drugs in the house. Ms. Marine doubled down and denied that she had.

She further claimed at the Fatico hearing that she did not know that the money she was storing was the proceeds from drug sales. And both of those pieces of testimony were false.

Ms. Marine conceded as much during her December 2024 plea re-allocution, where she expressly admitted that she would hand deliver drugs to another person and knew full well that those items were narcotics. Her testimony at the Fatico was

also flatly contradicted by the evidence at Mr. Ortega's trial, which overwhelming established that Ms. Marine personally handed drugs to others and knew full well that she was collecting money from drug sales.

Against this, Ms. Marine argues that the enhancement should not apply because she was misadvised by her prior counsel and because she suffers from cognitive limitations and was not prepared to testify. Those excuses are not persuasive. She was asked directly and repeatedly whether she had handed out drugs and whether she knew she was collecting drug proceeds, and yet, she denied that under oath. Those were willfully false statements no matter what advice her counsel gave her or may have given her.

As to her cognitive limitations, no one has suggested that she's not competent or otherwise unable to answer clear questions, including ones that I asked myself.

The point remains that she was asked simple, clear questions about her involvement and squarely denied those allegations without hesitations. False statements that more than clear the bar for perjury under Section 3C1.1.

As to Ms. Marine's offense level, I find that 2D1.1(a)(2) does not apply, which means that her base offense level is 30. As the parties recognize, pursuant to the recent amendment, Section 2D1.1(a)(2) prescribes a base offense level of 38 for 841(b)(1)(C) offenders only when a jury found that

their conduct caused death or serious bodily injury or when the parties stipulate to such an offense or to a base offense level of 38.

Here, Ms. Marine was not convicted by a jury of causing death, nor is she charged with doing so. She also did not stipulate that she did so, nor did she stipulate to a base offense level of 38.

Indeed, the plea agreement itself makes clear that she believed that her base offense level is 30. The government argues that she stipulated to base offense level 38 in the plea agreement and points to the provision in which the parties agree that her base offense level would be 38 if the Court finds that the conspiracy charged in Count One, distributed controlled substances that caused the death of one of the victims. But nowhere in that provision did Ms. Marine stipulate to a base offense level of 38.

As noted to the contrary, she agreed only that she might have a base offense level of 38 provided that the Court found facts, certain facts to be true. That's not a stipulation at all since it just passes the buck to the Court to determine the facts.

Put simply, Ms. Marine did not stipulate to any facts whatsoever with respect to the offense causing death. So this language does not trigger 2D1.1(a)(2).

In asserting otherwise, the government cites a Sixth

Circuit case that I believe is off point in *United States v. Nedelcu*. The defendant stipulated in his plea agreement specific facts that satisfied the elements of money laundering, which meant that he was treated at sentencing as if he had been convicted of additional counts for that crime. That case, however, just stands for the obvious proposition that a defendant can stipulate to specific facts in a plea agreement. But that's not what happened here, because to reiterate, Ms. Marine did not stipulate to any facts with respect to death resulting from the offense. She just agreed to let the Court determine the facts, which is different. *Nedelcu* would be helpful for the government if, for instance, Ms. Marine had stipulated outright that her conduct had caused a death or that she had handed the drugs to Rainey that ultimately killed the victims. But, again, she didn't stipulate to any such facts here.

I'm also not persuaded by the other case cited by the government, *United States v. Tejada Aybar*. The defendant there stipulated to specific facts about his narcotics distribution and then argued that these facts did not establish that he had caused a death.

The Court then applied 2D1.1A over his objection but the defendant didn't even try and raise the issue that Ms. Marine raises now. Namely, that Section 2D1.1(a)(2) does not apply when there is a so-called conditional stipulation.

So the Court there didn't even consider the issue that's now before me. And when I look at it, I'm not persuaded that an agreement that doesn't involve any stipulated facts can qualify as a stipulation under 2D1.1(a)(2).

The government lastly suggests in a footnote that by rejecting its argument, the Court is ruling or may rule that the plea is unlawful. Not so. I'm simply ruling that 2D1.1(a)(2) isn't satisfied by the purported stipulation here. That doesn't mean that the plea agreement was contrary to the law. It just means that the contents of the plea agreement were not sufficient to trigger 2D1.1(a)(2), just like if the parties had stipulated to certain facts and a court found those facts were insufficient to satisfy all the elements of an offense. And that's different from invalidating a plea agreement as unlawful.

So for those reasons, I don't think that 2D1.1 is applicable.

Next, it doesn't appear that there's any dispute Ms. Marine is entitled to acceptance of responsibility points.

So based on those rulings, I find that Ms. Marine is entitled to a three-point reduction pursuant to 3E1.1(a) and (b).

Although reductions are typically not granted to defendants who also receive an obstruction of justice enhancement, the guidelines permit both adjustments to apply in

certain cases such as where a defendant initially obstructs justice, but later accepts responsibility for her offense. *See, e.g., United States v. Enriquez*, 42 F3.d 769.

Ms. Marine has now fully admitted her conduct so she's entitled to the three-point reduction pursuant to 3E1.1(a) and (b).

So for the reasons stated above and based on the agreement of the parties as to the remaining issues, I find Ms. Marine's base offense level is 30 pursuant to 2D1.1(a)(5) and (c)(5), two levels are added under 2D1.1(b)(1), another two under 2D1.1(b)(12), and two more for obstruction of justice under 3C1.1, making it 36. Then that figure is reduced by three acceptance points, resulting in an applicable offense level of 33. With a criminal history category of I, her recommended guidelines sentence is thus 135 to 168 months in prison.

So other than the two issues that you all litigated in your submissions, are there any other objections to my calculation of the guidelines?

MS. SANTILLO: No, your Honor.

THE COURT: And from the government?

MR. HERMAN: No, your Honor. I may seek just a clarification of the Court's ruling on the death resulting guideline, just given that our office has used plea agreements like this frequently, that where there's a Fatico solely on the

issue of whether the death resulting guideline applies. There's multiple --

THE COURT: Do you agree that there needs to be a stipulation?

MR. HERMAN: No, your Honor.

THE COURT: Or a jury finding?

MR. HERMAN: No, your Honor. The parties have agreed that if, if the Court makes the requisite factual finding, then the death resulting guideline applies. It's like any other contract with a conditional -- it's a conditional stipulation.

We cited a case where Judge Castel recently found the death resulting guideline applies after a Fatico hearing with a virtually identical plea agreement. Judge Ramos in *United States v. Huertero*, which is 20 CR. 580, made the same finding.

So we respectfully submit that if the Court is ruling that the government -- that the plea agreement cannot legally -- the Court cannot legally find the death resulting guideline, then the government has given up substantial consideration for nothing. I mean, we agreed to drop mandatory minimum time to allow the defense to contest the death resulting guideline.

Our view has always been it's a death resulting guideline applied. The defense asked for this. The defense asked to have a Fatico so the Court could make that finding. And they got that Fatico. And we think we've proved it

factually. And we think the plea agreement clearly states that if we've proven it factually, then the parties agree pursuant to the guidelines provisions that the death resulting guideline applies.

THE COURT: I disagree for the reasons that I stated earlier. I don't read the plea agreement -- I mean, in the plea agreement, it says that it's the defendant's position that the base offense level is 30. So I don't read this to be a stipulation that that applies.

MR. HERMAN: Judge, respectfully, the plea agreement also says that, first, the parties agree not to appeal or collaterally attack the Court's determination of the base offense level, including whether death or serious bodily injury applies.

Then the parties agreed on top of page three. Pursuant to 1B1.2(a) and (c), which is the provision of the guidelines that allows the parties to agree that any guideline applies, even one that doesn't apply to the particular offense, that if, if, the Court then makes the factual determination, the parties agree to this. It says "the parties." Then, then the offense of conviction establishes that death resulted from the use of the controlled substance, and the death resulting guideline applies.

It couldn't be -- in our view, it couldn't be clearer. The parties have agreed that that this applies if the Court

makes a factual finding. We think that's a very clear, from principles of contract law, stipulation that if the Court makes a factual finding, the parties have agreed to a particular guideline. And in consideration for that, the government dropped substantial counts here.

So we're concerned about a finding that legally this type of a conditional plea or stipulation can't pass muster before the Court.

THE COURT: Ms. Santillo, do you want to be heard at all? I mean, again, I've read the submissions, but...

MS. SANTILLO: Yes, your Honor.

I would just note that, you know, I think it's very clear that Ms. Marine reserved the right to argue the base offense level 30 applies, and that includes the full extent of the factual and legal arguments to advocate for that position. There was no stipulation about any fact, any role. And I think, you know, the amendment clarifies that that was the intention of the guideline in the first place that it has to -- any stipulation has to serve the functional equivalent of a jury verdict or an admission. And I think that just isn't present in this case. So I think -- I obviously agree with your Honor's position and believe that it wasn't triggered here.

THE COURT: Yeah. I have to say I agree with that. I mean, this plea agreement was written before the amendment.

And so all I can suggest is maybe the office should consider clarifying this language with respect to the amended provision and make it entirely clear that this constitutes a stipulation to that.

But I read this as you are agreeing that you have a dispute, and that you agree that if I make a finding, then this is the offense level that follows. But that she's not agreeing that that is correct. And I just think that there's a distinction there. So...

MR. HERMAN: Just, again, just to clarify.

THE COURT: Yeah.

MR. HERMAN: Is the Court ruling that the parties can never carve out the determination of whether the death resulting guideline applies at a Fatico? Or is it simply --

THE COURT: No, I think can you clarify the language. I mean, I don't want to be drafting off the cuff or proposing draft changes, but I think there could be language that could be added in which you say this constitutes a stipulation -- to the extent the Court were to find X, this would constitute a stipulation to the 2D1.1 enhancement, you know, consistent with blah, blah, blah.

I mean, I think there's a way to do this. I just read this as you have different positions. You're leaving it to the Court. If the Court decides one thing, you agree that this offense level applies. If the Court decides something else,

the other guidelines applies. But I don't read this as a stipulation that it's applicable and that it does apply. And the 2024 amendment, again, which was after this plea agreement was drafted, I think makes clear that you need to do -- there needs to be one of those two things. There needs to either be a jury finding or there needs to be a stipulation to the facts, specifically, or to the offense level. And I think here, you're just stipulating as to what the possibilities are. But I just don't read it the way you do. But I think it can be remedied.

MR. HERMAN: Thank you, your Honor.

THE COURT: Okay.

So as I said a moment ago at the start, that that guideline range is only advisory, courts can impose a sentence outside of that range based on one of two legal concepts, a departure or a variance. A departure allows for a sentence outside of the advisory range based on some provision in the guidelines themselves. In the plea agreement, both parties agree that no departure from the guidelines range of 108 to 240 months is warranted.

Nonetheless, I've considered whether there's an appropriate basis for departure from the advisory range within the guidelines system. And while recognizing that I have the authority to depart, I don't find any grounds warranting a departure under the guidelines. But I also have the power, of

course, to impose a non-guidelines sentence based upon what we call a variance pursuant to the factors set forth in 18, United States Code, Section 3553(a), which is what I know Ms. Marine is seeking.

So, with that, why don't I hear from the parties. Would the government like to be heard? I understand that Mr. Ghahramani would like to be heard today as well.

MR. HERMAN: Yes, your Honor. Again, the Court knows this case very, very well, just as well as the Court might know any other case, given the trial, the Fatico hearing, the extensive briefing in this case, as well as with the codefendants. So I'm not going to belabor the issue.

Regardless of the Court's ruling, factually, we believe we've proven Marine played an important, consequential, causal role in the deaths of the three victims here. And that's a tremendously egregious factor. And you combine that with her truly egregious attempt to obstruct justice at the Fatico hearing.

You know, I think we would be in a different place if Ms. Marine had come in and immediately accepted responsibility, like William Drayton did, and expressed sincere remorse from the outcome, from the jump. But she didn't do that. She minimized, lied, and obstructed justice from the beginning. And I think that cannot be countenanced.

So that is why we think -- we raised our

recommendation. Initially, we agreed with the probation office which recommended 180 months. But we think here there just has to be additional punishment for this level of lying under oath.

It's a rare case where the government is able to conclusively disprove anybody's testimony. But when it happens, there needs to be a consequence for that. And this is --

THE COURT: Just to be clear, the probation recommended a downward variance of 180 months having calculated the guidelines to be 240. So now I've calculated them at 135 to 168, just to be clear.

MR. HERMAN: That is correct. Yes. That is correct. But if you read the reasons for there recommendation, which is similar to our reasons, it really turns on the facts here, rather than the guidelines calculation.

THE COURT: And there's no dispute at all, nor should there be, about how serious this crime was, how devastating the harm caused by this conspiracy has been. There's no question about that, you know, as I've heard from Mr. Ghahramani before and have no doubt I will hear again today.

MR. HERMAN: We couldn't agree more with your Honor there.

And, look, we concede there are some mitigating facts here, which is why we offer the (b)(1)(C) with the -- I guess we made a mistake. We thought in connection with that

(b)(1)(C) offer that we would have available the death resulting guidelines. The Court obviously ruled otherwise. But we did that because of the fact, you know, some of the mitigating facts that the defense has raised. Her age --

THE COURT: She faced a ten-year mandatory sentence before?

MR. HERMAN: Fifteen, your Honor.

THE COURT: Fifteen with the death --

MR. HERMAN: Yes. Yes. And, in all honesty, we were contemplating superseding with the deaths, which I think we put on the record, had this proceeded to trial. We didn't end up getting there. But it was a significant concession, but it does go to the seriousness of the offense. And the mitigating circumstances, I think we tried to balance it in that offer. So we capped her sentencing exposure at much less than what her son Ortega received from the Court.

But I do think, though, that some of the mitigating -- the mitigation raised by the defense is misplaced. One is the MDC conditions. We put in our letter, you know, a statement that Judge Caproni recently made, and she's well-versed in this issue being on the MDC Judge's Committee.

The MDC here, this is actually a case where they have provided a substantial amount of medical attention to the defendant, including multiple trips outside the facility to see outside physicians, including for cancer screenings, for

surgery that they recently performed. And they provided her with prescription medication that she needs and is entitled to on a very quick basis. And in some instances, the government worked with the MDC to do that.

THE COURT: Are you disputing that she had to wait over nine months for a colonoscopy, another five months for an appendectomy? I mean, look, I don't think that the BOP can't care for her, at least at this point in time, that evidence is not before me. But I do think that over the last 15 months, even if it's getting better at the MDC, there have been very serious concerns, and that time spent at the MDC over the last 15 months is significantly harsher than it was in the past and it should ever be. And that especially if someone has health conditions, that part of the concerns were about people getting proper treatment.

So I don't think that that's a misplaced concern. I've got to balance it with everything else, including critically the seriousness of the offense and the harm caused by this conspiracy, just the devastating harm, and the need for deterrence and all the other factors that I'll discuss. But I don't think it's not a relevant factor. I think it is relevant. I think it's proper for me to consider it.

MR. HERMAN: I totally agree with that, Judge. And we said that in our supplemental sentencing submission that the Court can and should consider these conditions. I just

think -- I don't want the Court to either understate or overstate them. There's a lot of stories that come out of the MDC about lockdowns, about maggots in food, that aren't true. And the Court shouldn't make a finding of such horrible conditions, specifically in this case, without evidence.

I agree that it's a jail, and at times -- more so on the male side than on the female side, but I don't disagree that the conditions can be difficult. But the -- certain arguments that are often made, like about the food issue that the defense raised as in this *Daily News* article, that we think is just simply untrue. I don't think it warrants a drastically low sentence in this case when the defendant has suffered no medical harm. In fact, has been treated, and at best, she can say she wished she got certain procedures quicker. But the procedures were performed, and the appropriate procedures were performed.

So, again, the Court knows the case well. Our argument is really about the facts here, not about the guidelines, and we think a significant sentence is appropriate.

THE COURT: Thank you.

Mr. Ghahramani, thank you for being here today. Would you like to come up and be heard?

MR. GHAHRAMANI: Yes. Please.

THE COURT: I just want to say that I've read all of the deeply moving letters about Julia, Amanda, and Ross, and I

can only imagine how hard it is for you to be here.

MR. GHAHRAMANI: Thank you, your Honor.

THE COURT: So thank you for being here.

MR. GHAHRAMANI: I think you've seen this picture before. I don't remember. I know I brought one earlier. So Julia's high school graduation.

THE COURT: I think you had that with you at the first bail hearing.

MR. GHAHRAMANI: Yes. Yes.

THE COURT: The first time I saw you.

MR. GHAHRAMANI: And I just heard the discussion between you and Mr. Herman about, if I understand it right, whether the actions caused death or did not cause death.

THE COURT: It wasn't a factual -- it wasn't about whether it did or it didn't. It was just a legal argument or ruling about whether she had consented to it, stipulated to it. So I did not make a factual finding that her actions did not cause death, just to be really clear. It was just about was this particular standard legally met with respect to what she stipulated to in the agreement.

So I just want that to be clear to you, sir.

MR. GHAHRAMANI: Thank you. Thank you for that clarification.

I also heard discussion about -- this is not my first time, as you know.

THE COURT: I know.

MR. GHAHRAMANI: MDC, the conditions in MDC. It's, it's unbelievable for me after losing my daughter to hear complaints about, you know, incarceration condition as like a major factor for lenience, when every day we are living in a nightmare and a hell. I can barely walk now, my inflammation. I talked to Bruce Scher, their family, as you know, is devastated. So where's the -- you know, it's really hard to listen to. And I'm following as best I can the pluses and the minuses in the sentencing.

And I want to point out that one thing I have not heard at all from her is any remorse. Maybe you heard it. I didn't hear it. Any acknowledgment that even if she didn't handle that specific bag, that three people died as a result of what she was actively involved in. It wasn't a, you know, it was not a tangential involvement. And, surely, that has to, when you do a sentencing guideline, does that play a role in, you know, like acknowledging the pain that you have caused.

We've heard from another defendant who sent a letter, and that affected us and we took that very much to heart. But there's been nothing. We've been dragged here. This is torture. For how many, two years now. This has been going on. On and off. This and that. You know, we sit here. Is this going to trial. You know, this is -- this is a crime, as you know, with many victims. Some direct, some less direct. And

I'm just asking you to please take that into consideration when you provide sentencing.

THE COURT: Absolutely. And, to be clear, you haven't heard my thoughts yet. We were talking about sort of legal arguments.

MR. GHAHRAMANI: Yeah.

THE COURT: And some factual arguments. But I really appreciate you saying that and I think you're absolutely right.

MR. GHAHRAMANI: Thank you. That's all I had to say. I appreciate that. I think an acknowledgment could have gone a long way. But it's just -- there's no -- I've said what I need to say. I think you understand.

THE COURT: Thank you again for being here.

MR. GHAHRAMANI: Thank you very much.

THE COURT: Ms. Santillo, would you like to be heard?

MS. SANTILLO: Yes, your Honor.

Just on a personal level, I just want to acknowledge that, you know, I'm a mother, and as an advocate today, I have no intention of diminishing the grief and heartbreaks that these families have experienced, which, you know, it breaks my heart to hear what the families have gone through.

I do think that it's important for the Court to consider that along a lot of the other factors that we've tried to bring to the Court's attention. And we think in this case, the 3553 factors on the whole warrant a substantially below

guidelines sentence for a number of reasons. Principally because of Ms. Marine's age and her very serious health conditions. But I do want to address some of the issues that the government raised about Ms. Marine's role in the offense and the obstruction issue.

I too wish that I could go back and have been present with Ms. Marine from the beginning, because I do think while respecting your Honor's ruling about the obstruction enhancement, I do think that things could have been very different if Ms. Marine had gotten timely, careful advice. And if -- I think your Honor and the government both noted that there was overwhelming evidence in the case. I do think that there was a lot of evidence in the case that had to be pulled together to fully ascertain Ms. Marine's role, and to go over her options with her, and I don't think that was done before.

THE COURT: I get all of that. But she sat here and she looked me in the eye and she lied. She lied to me. She lied to everyone in this courtroom. And you don't need a lawyer to tell you not to lie. She took an oath. She swore that she would tell the truth, and she looked me in the eye and she acted as if she didn't know anything about anything. And none of that was true.

So I don't find -- there may have been concerns about her prior representation, but it was very clear to her that when she testified, she needed to tell the truth. And I think

that when someone lies in that way, not only are they not accepting responsibility, but they're more likely to recidivate if they think that they can just get away with lying. It doesn't show that they're really acknowledging what they did.

So, yeah, I hear your point. I understand why you're making it, but I don't find that persuasive.

MS. SANTILLO: And I just would say that, you know, I would ask the Court to just take into account the evolution of her position and that she does stand before the Court today fully accepting responsibility and I have heard remorse and I think you will hear remorse from her. And so --

THE COURT: I have to say, when I read all of these papers, and there are a lot of papers and submissions, I had the same exact reaction that Mr. Ghahramani had, which is: Where is the remorse? I mean, there was clearly no remorse when she testified because she was denying even knowing about it until later. Right? And I asked and the government asked in ten different ways the same question, and she lied and she lied again.

But even since then, and I'll give her the opportunity to say what she would like to say, but there does not appear to have any remorse. It's one of the things I wrote in my notes. Like, where is the remorse? And I'm waiting to see. Maybe she will express it today, but I haven't heard it.

MS. SANTILLO: And I do believe that will come along.

So moving onto another factor, which is I think Ms. Marine's role in the offense. I think that it's undisputed that she was not a leader of this conspiracy. And she was enlisted to join the conspiracy by her son, Mr. Ortega. We presented the Court with audio recordings that show that Mr. Ortega was verbally abusive to Ms. Marine. He was the dominating figure in this conspiracy. Mr. Rainey himself testified that Ms. Marine could not act except at the direction of Mr. Ortega. And I think that that's an important factor for the Court to consider when determining relative culpability.

And we submitted in our papers and we maintain our position that even in light of the obstruction issue, we do believe a sentence less than Will Drayton is warranted. And that is because Ms. Marine is not a leader or supervisor. She is not somebody who played a role in crafting the nature of the conspiracy.

THE COURT: It was all run out of her apartment. I mean, she's taking government funds for her apartment and then this conspiracy is being run out of her home.

MS. SANTILLO: Well, I mean, I think her son used her and verbally coerced her to participating in it. But it's clear that there were people who were -- this drug conspiracy was running whether she was present or not. It was something that he orchestrated. He had multiple people who were participating from multiple different locations. And really,

he was the master mind of this.

And other than that, Ms. Marine is a first-time offender. She has no other prior criminal offenses and she's 60 years old. I think that it was, you know, his strong influence in her life that sort of led to her involvement to this, which is not to say that she's not responsible for what she did. I'm just saying in terms of relative role and culpability, she had a lesser role in the conspiracy than Mr. Drayton, who was admittedly a supervisor of the conspiracy. And so, you know, that's where our sentencing request comes from.

I think there's a lot of factors in Ms. Marine's background that warrant leniency, including the trauma that she experienced in her life, the abusive relationships she's been in, which I think contributed to her susceptibility to being influenced by Mr. Ortega. I think the fact that she's been a hard worker her entire life and didn't stop working throughout the course of the conspiracy, even though she was suffering with cancer, shows that, you know, she's a hard working person who wasn't -- you know, didn't seek this out. And, you know, she regrets her participation in her assistance of her son. But, you know, I think it's a factor that other times in her life, she's just been working extremely hard and that's -- you know, she wasn't trying to get rich off of the drug conspiracy profits. She was, you know, sort of roped into the situation

by her son.

And your Honor imposed a very hefty sentence on Mr. Ortega, and I think that is not going to be a factor in her life. You know, he's been sentenced to 30 years in prison and he is, you know, even if she receives a sentence where she's able to live with her daughter Melanie in New Jersey who's here in the courtroom today, you know, I just don't think the circumstances that gave rise to her participation in this will reoccur.

So in terms of deterrence, I think that's a factor in the environmental factors that contributed to this.

You know, in terms of specific deterrence, I do think that this family has, obviously, you know, has suffered a lot of consequences as well with Mr. Ortega's imprisonment. His 18 year-old son is in this room. She is his grandmother. You know, the whole family appreciates that there are serious consequences from this offense. And so I think that that's a factor in terms of assessing what kind of sentence she needs to impreses upon her the seriousness of the offense. Her family is going to be feeling Billy's absence as well.

I think the most important factor here in seeking a variance below the guidelines, is the very, very serious and complex interrelated health conditions that Ms. Marine has and her age. She's 60 years old. She's a survivor of breast cancer who is taking medications to ensure that it doesn't

reoccur. She has precancerous poulps in her colon. Your Honor noted there was a nine-month delay in getting her a colonoscopy. I do believe that could have been a disastrous consequence for Ms. Marine. I do not think -- I think that not just at the MDC now, but in the BOP, it's well-documented that the BOP is not equipped to deal with the very serious health conditions of aging inmates. And I do fear that her conditions will only worsen.

One fact that I think is very serious is her chronic kidney disease. Which, you know, based upon, you know, our understanding of the condition, it's relatively advanced and, you know, has a life expectancy of approximately ten years. And that's with proper treatment. A sort of shocking fact is that we got the medical records from the MDC to review them in connection with our sentencing presentation and noted the medical conditions, but Ms. Marine herself was not aware that she had chronic kidney disease until we told her through our submission and our review of the records because MDC never communicated that to her.

She's had serious conditions throughout the time she was at the MDC including fainting spells, things that could be symptoms of this chronic kidney disease, but she wasn't given clear advice about what her conditions are and that prevents her family from advocating for her and her being able to self-advocate for herself.

So I think that's a harbinger of what's to come in terms of any time she's going to spend in custody going forward. This requires complex coordination with specialists to monitor her health going forward, and it's costly and inefficient to do it at the BOP. And I think that there are signs that -- including resignations at the highest level of the BOP and hiring freezes, that suggest that in the years ahead, it's going to be extremely difficult, even more so than it has in the past for an inmate with Ms. Marine's age and her health conditions, to get adequate care.

The potential for neglect, where the cancer in her family is so severe and she's a cancer survivor, is very real. So in asking for a substantially below guidelines sentence, I think I would just ask the Court to consider that, you know, the Sentencing Commission recognized that aging inmates with extremely serious health conditions, that's a factor that would warrant, you know, rise to the level of extraordinary and compelling reasons to grant release. And we would ask that your Honor heavily factor that into any sentencing recommendation.

THE COURT: Thank you very much.

Ms. Marine, is there anything you would like to say today?

THE DEFENDANT: Yes. I am very sorry for having helped my son. And I would never do it again. I'm very sorry

for the suffering and the pain that the family members and those present here in the courtroom are experiencing. I'm sorry.

THE COURT: All right. Thank you.

Is there any reason why sentence cannot be imposed at this time?

MS. SANTILLO: No, your Honor.

THE COURT: So I'm required to consider the advisory guidelines range of 135 to 168 months, as well as various other factors that are outlined in a provision of the law. It's 18, United States Code, Section 3553(a). And I've done so.

Those factors include but are not limited to the nature and circumstances of the offense and the personal history and characteristics of the defendant because each defendant must be considered individually as a person.

Judges are also required to consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from future crimes of the defendant, and avoid unwarranted sentence disparities, among other things.

So, look, this is an unimaginably tragic case. And nothing I say or do today is going to take the pain away from the family members, family, the victims' family members. I think, in this case, Ms. Marine's conduct, along with that of

her co-conspirators, and the harm that was done by this conspiracy is the most important factor that I need to consider.

There are other factors I need to consider as well. I have to. I have to balance everything, and I'm going to do that as best as I can. But, in doing so, I recognize that Mr. Ghahramani and all the other family members and friends of the victims here have received their own form of a life sentence.

Ms. Marine played an indispensable role in this narcotics distribution conspiracy, and she did so for almost four years. Not only did she allow her NYCHA-funded apartment to be used as a stash house, she supplied drugs to the couriers, she collected and stashed money and drugs in multiple safes in the residence, and it was all protected by firearms. And although she ultimately accepted responsibility, for too long she was dishonest, attempted to downplay her knowledge and participation, including, as I said earlier, under oath to me.

And I had written in my notes that she hasn't expressed any real remorse. Today she expressed it. It's the first time I've heard any remorse whatsoever. So it's a little bit too little too late, but she did indeed express remorse today.

According to the DEA, fentanyl is the single deadliest drug that our nation has ever encountered. Because of its low

cost and its potency, it's often mixed with other drugs such as cocaine. But that comes at grave risk of harm to customers, as it dramatically increases the likelihood that a fatal overdose for users who don't even know that the drugs they purchased were laced with fentanyl. And fentanyl is, of course, what killed Julia and Ross and Amanda.

And in terms of the seriousness of the offense; respect for the law; just punishment; deterrence, both specific and general; and protecting the public from future crimes of the defendant; those factors all weigh in favor of a very serious sentence.

So that is the most important thing I'm thinking about today that's driving my sentence. But there are other factors here, and I have to consider them and I have to balance them. That is my job.

I need to consider the fact that there is no evidence -- unlike with respect to Mr. Ortega -- there's no evidence that Ms. Marine knew that the drugs she was involved with distributing contained fentanyl. It doesn't matter legally for purposes of whether you can be convicted of the crime, but it is relevant to sentencing whether someone knew that they were peddling in this particular poison.

It doesn't excuse her conduct, far from it, but it is an important distinction, as is the fact that she didn't have a supervisory role.

I have considered the need to avoid unwarranted sentence disparities. I sentenced Mr. Ortega, as you all know, to 30 years in prison; Mr. Drayton, who was a runner and a mid-level supervisor, to 78 months, which to be clear was in his guidelines range. Mr. Rainey was cooperating; he has not yet been sentenced. Ms. Marine is clearly significantly less culpable than Mr. Ortega. And unlike Drayton, she allowed this distribution business to run out of her government-funded apartment and then lied about her conduct.

I have also considered all the arguments Ms. Marine has made, including her difficult upbringing, which included poverty and violence; her age, she's 60; her lack of her prior criminal history; as well as I think the strongest arguments with respect to mitigating factors are about her health. And that's something the guidelines themselves contemplate judges considering.

She has had breast cancer. She's at a high risk for colon cancer. She has stage three chronic kidney disease, osteoporosis, hypertension. She suffers from significant cognitive limitations and other disorders. So those are real concerns, and what kind of treatment she's going to get is a factor that I think I'm obligated to consider.

I'm also considering the fact that she's maintained gainful employment throughout her life and has made some efforts to rehabilitate herself while incarcerated. She

remained compliant while on pretrial release and has not incurred any disciplinary infractions.

And, as I said, I've considered all of that, but I think most importantly here is the seriousness of and the irreparable harm that she caused.

So having considered all of that, I'm ready to impose sentence. Ms. Marine, could you please rise for the imposition of sentence.

It's the judgment of this Court that you be committed to the custody of the Bureau of Prisons for a term of 135 months. I'm also imposing a term of supervised release of three years. I believe this sentence is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in the law. Please be seated while I describe the conditions of your supervised release, as well as the other details of your sentence.

So the standard conditions of release are contained on page 43 of the presentence report, and 44. Would you like me to read those aloud, or do you waive their public reading?

MS. SANTILLO: We would waive the public reading.

THE COURT: Just make sure you go over them carefully. And with respect to the mandatory conditions, also on page 43, are you also waiving that?

MS. SANTILLO: Yes, your Honor.

THE COURT: Okay. Do you have any objection to the

special conditions of release on page 45?

MS. SANTILLO: One moment, your Honor.

No, your Honor.

THE COURT: So you shall submit your person, any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media and effects to a search by any United States Probation Officer, and if needed with the assistance of law enforcement, any law enforcement. The search is to be conducted when there's a reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to search pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner. And the reason for this special condition is that the offense involved the possession of narcotics and firearms, and to protect the community.

You must not incur any new credit card charges or open additional lines of credit without the approval of the probation officer unless you're in compliance with the installment payment schedule. And this is because -- just to be clear, is there any restitution or forfeiture that you're seeking?

MR. HERMAN: No, your Honor.

THE COURT: Okay. Then I don't know that this is actually an appropriate condition.

Does the government agree?

MR. HERMAN: Yes, your Honor.

THE COURT: Okay. So I'm not going to impose this. I am imposing the search condition, but I'm not imposing the other two.

And Ms. Marine will be supervised in the district of her residence. I'm not going to impose a fine because the probation department has reported that it would be difficult for her to pay one. I am imposing the mandatory special assessment of $100, which shall be paid immediately.

Does either counsel know of any legal reason why the sentence cannot be imposed?

MR. HERMAN: No, your Honor.

MS. SANTILLO: No, your Honor.

THE COURT: All right. That's the sentence of this Court.

Ms. Marine, you have a right to appeal your conviction and sentence, except to whatever extent you may have validly waived that right as part of your plea agreement. If you do choose to appeal, the notice of appeal must be filed within 14 days of the judgment of conviction. If you're not able to pay for the cost of an appeal, you may apply for leave to appeal *in forma pauperis*, which simply means the court costs, such as

filing fees, will be waived. If you request, the clerk of court will prepare and file a notice of appeal on your behalf.

Are there any open counts that the government would like to dismiss or underlying indictments?

MR. HERMAN: Yes, we move to dismiss.

THE COURT: Okay. They'll be dismissed.

And, finally, I just want to say this is probably the most heartbreaking case I've ever had before me. And I want to thank Mr. Ghahramani again for being here today and sharing your feelings, which was really important.

We're adjourned unless there are other applications. Are there?

MS. SANTILLO: Your Honor, I would just ask that the Court recommend to the Bureau of Prisons that Ms. Marine be placed as close to her family as possible given her medical conditions.

THE COURT: Okay. But do you want me to make a recommendation with respect to a facility that can care for her medical conditions?

MS. SANTILLO: Your Honor, it's my understanding her care level is going to have to be scored.

THE COURT: Okay.

MS. SANTILLO: And that --

THE COURT: So I'll just say as close to New York City as possible.

MS. SANTILLO: Yes. Thank you.

THE COURT: Thank you. We're adjourned.

(Adjourned)